IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**PRASHANT JAIN**, an individual & Managing
Director of Sirphey L.L.C., *et al.*,

        Plaintiffs,

v.                                      No. CIV 22-0465 RB/LF

**PAUL ANDRUS**, Director of Community
Development in the incorporated County of
Los Alamos, *et al.*,

        Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs operated a wine bar (UnQuarked) in Los Alamos, New Mexico. Plaintiffs took advantage of an opportunity to move UnQuarked to another space in Los Alamos. The space needed some work before UnQuarked could reopen. Plaintiffs allege that they lawfully began the work but were stymied by a county official who issued an unwarranted Stop Work Order. Plaintiffs appealed the Stop Work Order to the Los Alamos Board of Appeals (Board of Appeals), which held hearings on the matter and denied the appeal. Plaintiffs appealed the denial to the Los Alamos County Council (Council), which upheld the Board of Appeals' decision. Plaintiffs filed an administrative appeal with a New Mexico state court. The state court remanded on the basis that the appeal was not ripe because the Board of Appeals failed to issue written findings.

On remand, the Board of Appeals held a second set of hearings and issued written findings. The Council could not reach unanimity on the appeal, which resulted in the decision being upheld. Plaintiffs' appeal is now pending at the state court. In the interim, Plaintiffs lost their lease because they did not open UnQuarked by an agreed-upon date. Plaintiffs assert that there were numerous irregularities in the entire process, which resulted in violations of their rights. Plaintiffs filed suit

against 24 defendants in this Court alleging 37 state and federal claims. Two groups of defendants, the "County Defendants" and the "Central Park Defendants," move to dismiss. The Court will grant the Central Park Defendants' motion, grant in part the County Defendants' motion, and stay this matter pending a final decision by the state court in the parallel proceeding.

## I.     Statement of Facts[1]

### A.     The parties relevant to the motions under advisement.

Plaintiffs[2] Sirphey L.L.C., Prashant Jain, and Cortni Nucklos operated UnQuarked, a wine bar originally located in the Central Park Square Shopping Center in Los Alamos, New Mexico. (Doc. 1 (Compl.) ¶¶ 13, 19, 32, 48, 53.) Defendant Philip Kunsberg co-owns and manages Defendant Central Park Square L.L.C. (CPS), which operates the shopping center. (*Id.* ¶¶ 13, 21.) Defendant Terry Salazar is an agent of Kunsberg and CPS. (*Id.* ¶ 43.) Kunsberg, CPS, and Salazar refer to themselves collectively as the Central Park Defendants. (Doc. 43 at 3.)

Defendant County of Los Alamos (the County) is governed by Defendant Council, an elected body. (Compl. ¶¶ 11–12.) Defendant Harry Burgess was Manager of the County and served as a member of Defendant Board of Appeals. (*Id.* ¶ 7.) The Board of Appeals "is an administrative board of the [County] before which appeals of actions taken by Los Alamos County building officials were heard." (*Id.* ¶ 5.) Defendant Randal Ryti was a member of the Council and of the Board of Appeals. (*Id.* ¶ 54.) Defendant Sara Scott was Chairperson of the Council and the original Chair of the Board of Appeals. (*Id.* ¶¶ 5, 46.) Defendant Terry Priestley replaced Scott as Chair of the Board of Appeals during Plaintiffs' appeal. (*Id.* ¶¶ 5, 34.) Defendant Philo Shelton is a County

---

[1] The Court recites the facts in a light most favorable to Plaintiffs.

[2] Sirphey is a domestic limited liability company. (Compl. ¶ 48.) Jain is owner, officer, and managing partner of Sirphey, and Nucklos is an officer and the communication director for Sirphey. (*Id.* ¶¶ 19, 32.)

employee and was a member of the Board of Appeals. (*Id.* ¶ 52.)

Defendant Michael Arellano was the Chief Building Official for the County. (*Id.* ¶ 2.) Defendant Denise Cassel was Human Resources Manager for the County. (*Id.* ¶ 8.) Defendant J. Alvin Leaphart "is County Attorney for the Council, the County Manager, the County Departments, and the Board[ of Appeals] . . . ." (*Id.* ¶ 23.)

Defendant Community Development Department (CDD) is a county department charged with performing building inspections in the County of Los Alamos. (*Id.* ¶ 10.) Defendant Paul Andrus is the Director of the CDD. (*Id.* ¶¶ 1, 10.) Defendant Adrienne Lovato is employed by the CDD. (*Id.* ¶ 25.) Defendant Larry Valdez is an official in the CDD. (*Id.* ¶ 55.) The Records Information Management Office (RIM) manages information for the County. (*Id.* ¶ 41.) Defendant Barbara Ricci manages the RIM. (*Id.*) Together, the County, its employees, its departments, and the Board of Appeals refer to themselves as the County Defendants. (Doc. 27 at 3.)

### B. Arellano identified minor repair work necessary for UnQuarked to open in the Mari Mac Village Shopping Center.

Plaintiffs wanted to relocate UnQuarked from the CPS shopping center to a new location in the Mari Mac Village Shopping Center (the Mari Mac), which was owned by Defendant Smith's Food and Drug (Smith's). (Compl. ¶¶ 49, 53, 60.) They planned to open UnQuarked as a wine bar and restaurant, and they considered Mari Mac the "ideal" location for this venture because it had previously housed a restaurant in the space and contained the necessary "code-compliant electrical, fire, plumbing[,] and building infrastructure." (*Id.* ¶¶ 60–61.) Plaintiffs learned that Smith's "had plans to upgrade [Mari Mac] and relied upon this representation in making their decision to move into the new location." (*See id.* ¶ 62.)

On March 6, 2019, prior to signing the lease, Jain inspected the Mari Mac space with Chief Building Official Arellano "to identify items and areas" that would require a permit for

improvements or repairs before UnQuarked could open. (*See id.* ¶¶ 91, 93.) According to the Complaint, Arellano represented to Jain that Plaintiffs would need to do "minimal work" to ready the space for opening and needed only one permit for work to cut a drainage canal. (*Id.* ¶¶ 72, 93–96.1.) Sirphey signed a lease for the Mari Mac space on April 18, 2019. (*Id.* ¶ 24.) The lease contained an "open by" provision: if Plaintiffs failed to open UnQuarked by August 1, 2019,[3] the lease was subject to termination. (*See id.* ¶¶ 66, 394.)

Sirphey filed a permit for the drainage canal on September 30, 2019; the permit issued on October 4, 2019; and the work was completed and approved. (*Id.* ¶ 94(i).) During the March 2019 inspection, Arellano also identified necessary minor concrete flatwork repairs, and "[b]uilding officials . . . represented that concrete flatwork required no permit." (*See id.* ¶¶ 91, 95.) Despite these representations, "the CDD [later] adopted the position that" Plaintiffs were required to apply for a permit for the concrete flatwork. (*See id.* ¶¶ 95–96.) Plaintiffs filed the second permit application for the concrete work on November 15, 2019. (*Id.* ¶¶ 94(ii), 96.1.) The application reflected a proposed improvement value of $800.00. (*Id.* ¶ 98.) In the meantime, Jain performed other work in the space that required no permit, such as procuring appliances and materials, "changing light bulbs, painting[,] and building an unattached wine bar." (*Id.* ¶¶ 99–101.)

### C.   Plaintiffs allege that Arellano's misconduct began in May and July 2019.

In May 2019, the local newspaper published an article about the upcoming opening of UnQuarked in its new location. (*Id.* ¶ 102.) Shortly thereafter, Arellano "confronted Jain" and told "him that UnQuarked would not be opening anytime soon." (*Id.* ¶ 103 (quotation marks omitted).) On July 12, 2019, Jain met with "Arellano's superiors, Andrus and Burgess[,]" to complain about

---

[3] The Complaint contains several date discrepancies. For example, one paragraph identifies the "open by" date as August 1, 2020 (Compl. ¶ 285(vii)), while others identify the date as August 1, 2019 (*see, e.g.*, *id.* ¶¶ 66, 394). The Court presumes that the 2019 date is correct.

"Arellano's threat and unprofessional conduct . . . ." (*Id.* ¶ 104.) After this meeting and in the presence of Andrus and Lovato, "Arellano falsely accused [Plaintiffs] of installing an illegal cooking hood in" the UnQuarked space. (*Id.* ¶¶ 106, 108.) "Arellano threatened to have [a Mari Mac custodian] perjure himself by swearing a (false) affidavit" regarding the cooking hood, despite date-stamped photos taken during the March 2019 walk-through that showed the hood was already on site. (*Id.* ¶¶ 56, 109–10.) "Arellano later admitted under oath during [an appeals hearing on this matter] that the hood was pre-existing." (*Id.* ¶ 112.)

### D.     Arellano issued a Stop Work Order in November 2019.

On November 10, 2019, CDD employee Lovato took photographs of UnQuarked's interior through the front window without giving notice to Plaintiffs or obtaining a warrant. (*Id.* ¶¶ 25, 126–27, 131.) Lovato did not have access to the interior of the space and had no view of the kitchen area through the front window. (*Id.* ¶ 131.)

On November 12, 2019,[4] Arellano visited the space and saw "that no un-permitted construction had occurred . . . ." (*Id.* ¶¶ 113–17.) On November 22, 2019, Arellano issued a Stop Work Order (also referred to as a Red Tag). (*Id.* ¶ 120.) Arellano later testified before the Board of Appeals "that he had pre-drafted the [Stop Work] Order in his office on November 12, 2019[,]" before he visited the space on that same date and despite not having visited since March 2019. (*Id.* ¶¶ 119, 155.) He testified that he issued the Red Tag "as a result of [Lovato's] November 10, 2019 inspection." (*Id.* ¶ 149.) "The Red Tag cited no specific violation" but read: "No Permit for Work, Bldg, Plumb, Elect, Mech. + Fire." (*Id.* ¶¶ 121, 146 (emphasis omitted).) Arellano testified, however, "that he saw nothing in [Lovato's] November 10, 2019 photos . . . that would require

---

[4] The Complaint contains additional date discrepancies regarding events that occurred in either November 2019 or 2020. (*See, e.g.*, Compl. ¶¶ 113, 122, 126, 134, 145.) The Court believes the events occurred in 2019. Regardless, the Court finds that it may decide the motions to dismiss without further clarification on the date.

plumbing, mechanical, or fire permits . . . ." (*Id.* ¶ 150.) Plaintiffs assert that Arellano failed to take several required steps before issuing the Red Tag, including an inspection of the site, a finding of "a violation tied to an applicable code[,]" and written notice to the site owner of the reasons for the Red Tag. (*See id.* ¶¶ 151–56 (discussing Los Alamos County Code of Ordinances (LACCO) § 10; N.M. Admin. Code § 14.5.3.10).)

Plaintiffs lodge a number of other allegations against Arellano that the Court need not examine in detail for purposes of this Opinion. For example, Plaintiffs assert that Arellano "reversed the previously 'passed' inspection performed under the first permit" (*id.* ¶¶ 122–23); admitted under oath that he altered Plaintiffs' November 2019 work permit valued at $800.00 to a value of $8,000.00 by adding a zero (*id.* ¶¶ 167–75); and illicitly continued in his County position after he was convicted of an Aggravated DWI in February 2019 (*see id.* ¶¶ 256–65).

### E.   The Board of Appeals denied Sirphey's appeal of the Red Tag, and the Council affirmed the decision.

Sirphey filed a letter appealing the Red Tag on November 22, 2019. (*Id.* ¶ 199.) Plaintiffs assert that the County delayed forming a Board of Appeals to hear the appeal. (*Id.* ¶ 200.) The Board of Appeals held virtual hearings on June 11, June 29, July 14, and July 27, 2020. (*Id.* ¶ 203.) "Prior to the first hearing, County Attorney Leaphart drafted a document he titled 'Procedural Scheduling Order' (PSO)." (*Id.* ¶ 205.) The Board of Appeals, without notice to Plaintiffs, adopted the PSO, which governed the Board of Appeals' deliberations. (*Id.* ¶¶ 206–08.) "Chairwoman Scott refused to allow [Plaintiffs] any inquiry into the PSO" and "stated that the PSO was similar to every other scheduling order" the Board of Appeals used for administrative appeals. (*Id.* ¶¶ 208–09.) Plaintiffs assert that this statement was false, as "the Board had never in its history adopted a similar PSO." (*Id.* ¶ 211.) The PSO imposed a "substantial evidence" burden of proof on Plaintiffs.

(*Id.* ¶ 212(ii)–(iii).)

Plaintiffs allege that several irregularities occurred during their appeal that affected their due process rights. (*Id.* ¶ 285.) For example, the Board of Appeals allegedly barred Plaintiffs from introducing evidence, cross-examining Arellano about the basis of the Red Tag, questioning witnesses' credibility, or objecting during cross-examination. (*Id.* ¶ 285(i)–(iii), (viii), (xviii).) Plaintiffs assert that several Board of Appeals members and the County's attorney had conflicts of interest or were non-neutral as described below in Section I(F). (*See id.* ¶ 285(iv)–(vi).) Finally, on July 27, 2020, the Board of Appeals denied the appeal with a verbal order and declined to offer written findings on advice of Leaphart in contravention of county and state authority. (*Id.* ¶¶ 213, 285(xix) (citing N.M. Stat. Ann. § 39-3-1.1; LACCO § 10-84(b)).) As a result, Plaintiffs had no written findings to produce "to the next appeals body – the Council." (*Id.* ¶ 215.)

Plaintiffs appealed the denial to the Council on September 9, 2020. (*Id.* ¶ 289.) Although some "Council Members expressed concern over the Board's process and failure to issue a written decision[,]" the Council voted to affirm the denial. (*Id.* ¶ 293.)

## F.    Defendants' alleged motivation for the conduct.

Plaintiffs allege that Defendants were motivated against UnQuarked's opening for two main reasons: competition and County interests. First, Plaintiffs assert that Arellano was friends with Salazar, who was a "confederate" of UnQuarked's competitor, Boese Bros. (*See id.* ¶¶ 79–82.) Plaintiffs assert that Arellano and Salazar joined together to "ensure the demise of UnQuarked[] . . . ." (*Id.* ¶ 179(ii).)

Second, Plaintiffs assert that after Sirphey signed the lease for the space at the Mari Mac, a developer—New Mexico Innovation Triangle (NMIT)— "expressed interest in demolishing and redeveloping the . . . Mari Mac shopping center." (*Id.* ¶ 67.) "Sirphey's [l]ease impeded [those]

plans . . . ." (*Id.* ¶¶ 70, 233.) Plaintiffs allege that "[t]he Council, through Scott, stepped into the role of facilitating [the] redevelopment deal . . . ." (*Id.* ¶ 68.) They further allege that Arellano was "in league" with the Council in their objective to redevelop the Mari Mac and that he sought and obtained a copy of their private lease for the Mari Mac space. (*Id.* ¶¶ 132, 179.)

At times, Scott and Ryti served on both the Board of Appeals, which denied Sirphey's appeal, and of the Council, which upheld the Board of Appeals' decision. (*See id.* ¶¶ 218, 230–31, 237.) Plaintiffs assert that Scott and Ryti actively promoted the proposed redevelopment of the Mari Mac and advocated against Plaintiffs' interests in the local press. (*See id.* ¶¶ 218(ii), 234–36, 241–42.) Scott also communicated directly with NMIT about the project. (*See id.* ¶ 218(i), (iii)–(v).) Plaintiffs allege that Scott and Ryti were not neutral and should have recused themselves from both bodies. (*See id.* ¶¶ 230, 237–38.) Finally, Plaintiffs allege that the Board of Appeals purposefully delayed proceedings because it knew that the lease was subject to termination under the "open by" provision. (*Id.* ¶ 285(vii).)

Plaintiffs assert that Leaphart had a conflict of interest because he represented the Board of Appeals, the Council, and the County. (*Id.* ¶¶ 247–48, 253.) As a result of Leaphart's involvement in the three, Plaintiffs allege that the Board of Appeals and the Council were neither neutral nor independent. (*See id.* ¶¶ 249–50.)

### G. Plaintiffs appealed the Council's decision to the state district court.

After the Council affirmed the Board of Appeals' decision in September 2020, Sirphey appealed to the state district court and named the Board of Appeals and Arellano as defendants. (*See id.* ¶¶ 295–99.) *See also Sirphey LLC v. Bd. of the Cnty. of Los Alamos*, No. D-132-CV-2021-000002, Admin. Appeal (1st Jud. Dist. N.M. Jan. 6, 2021).

On December 1, 2021, the state court remanded Plaintiffs' appeal, finding that the matter

was not ripe because the Board of Appeals did not issue written findings. (*See* Doc. 52-2.) The court found that Sirphey had "a procedural due process right to the written findings of fact" and the defendants had "denied [Plaintiffs] procedural due process" by failing to issue written findings. (*Id.* at 4.) The court directed the Board of Appeals to produce written findings of fact. (*See id.*)

Sirphey later moved for sanctions. (*See* Doc. 52-3.) The state court issued a comprehensive opinion detailing the procedural history of the case with particular emphasis on the defendants' conduct in pursuing dismissal of Sirphey's appeal on technical grounds "at every opportunity to avoid having to correct an error [(*i.e.*, the Board of Appeals' failure to file written findings of fact)] they were well aware of." (*Id.* at 5.) The court found that the defendants "advanc[ed] an unreasonable position" and engaged in sanctionable conduct. (*Id.* at 8–9.)

**H.      The second set of hearings and appeals after remand.**

The Board of Appeals held a second series of hearings on January 19, 21, 24, and 25, 2022. (Compl. ¶ 310.) The Board of Appeals closed the hearings to the public "and did not accept any new evidence[,]" such as Arellano's DWI conviction. (*Id.* ¶ 311.) Plaintiffs raised a question regarding whether the Board of Appeals was subject to the Open Meetings Act (OMA), N.M. Stat. Ann. § 10-15-1, but were rebuffed. (*See id.* ¶¶ 314–16.) In written findings, the Board of Appeals ruled against Plaintiffs but identified no specific work that "violated any building source authority." (*Id.* ¶ 323; 332–340 (discussing relevant authority).)

On January 25, 2022, Plaintiffs appealed the decision to the Council. (*Id.* ¶ 330.) The Council could not reach unanimity, which resulted in the Board of Appeals' decision being upheld. (*Id.* ¶ 331.) Sirphey filed a second appeal of the Council's decision, which is now pending before the state district court. (*Id.* ¶ 341.) *See also Sirphey LLC v. Bd. of the Cnty. Council of Los Alamos Cnty.*, D-132-CV-2022-00024, Pet. for Writ of Cert. (1st Jud. Dist. N.M. Apr. 20, 2022); *id.*,

Statement of Appeals Issues (Aug. 29, 2022). Plaintiffs have identified the issues on appeal as:

> a. Whether Section 10-84 of the [LACCO] is unconstitutionally vague and void;
> b. Whether Section 10-84 of the LACCO is unconstitutional as applied and on its face; and
> c. Whether the [County and Arellano] have denied [Sirphey] its due process rights.

*See id.*, Statement of Appeals Issues (Aug. 29, 2022). Plaintiffs allege that "[d]elay in opening UnQuarked led to termination of the [l]ease." (Compl. ¶ 303.)

## I.  Other allegations relevant to this Opinion.

Plaintiffs "submitted multiple IPRA requests to various government officials for information related to this matter." (*Id.* ¶ 350.) Plaintiffs assert that many of their "requests went unanswered, partially answered, [or were] excessively redacted or materially altered." (*Id.* ¶ 351.) Plaintiffs allege that the RIM Office and CDD employee Larry Valdez altered records in response to IPRA requests. (*Id.* ¶¶ 354–63.) Plaintiffs also allege that they gained access to records that show Arellano treated Sirphey differently from other businesses, including Boese Bros., Smith's, and Fleur de Lys. (*See id.* ¶¶ 135, 144, 716.)

Plaintiffs assert 37 claims in this lawsuit. The Court will discuss the claims relevant to this Opinion in its analysis below.

## II.  Legal Standards

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Emps.' Ret. Sys. of R.I. v. Williams Cos.*, 889 F.3d 1153, 1161 (10th Cir. 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quotation omitted). The Court will "accept as true 'all well-pleaded factual allegations in a

complaint and view these allegations in the light most favorable to the plaintiff.'" *Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1280 (10th Cir. 2013) (quotation omitted).

"[W]hile ordinarily, a motion to dismiss must be converted to a motion for summary judgment when the court considers matters outside the complaint, *see* Fed. R. Civ. P. 12(d), matters that are judicially noticeable do not have that effect . . . ." *Genesee Cty. Emps.' Ret. Sys. v. Thornburg Mortg. Sec. Tr. 2006-3*, 825 F. Supp. 2d 1082, 1122 (D.N.M. 2011) (citation omitted). The Court may take judicial notice of filings in the related state court cases in deciding the motions to dismiss. *See Pace v. Swerdlow*, 519 F.3d 1067, 1072 (10th Cir. 2008).

## III.   County Entities

Plaintiffs name the "County Council of the County of Los Alamos" and the "County of Los Alamos" as defendants. (Doc. 27 at 3; Compl. at 1.) Yet, New Mexico law "requires that suits brought against a county be brought against 'the board of county commissioners of the county of [ _____ ] . . . ." N.M. Stat. Ann. § 4-46-1. Defendants assert that the correct entity is the Board of County Commissioners of the Incorporated County of Los Alamos. (*See* Doc. 27 at 3.) Plaintiffs do not disagree. (Doc. 52 at 9.) The Court refers to this entity when it references "the County."

Plaintiffs also name the County Community Development Department, the County Board of Appeals, and the County Records Information Management Office. (*See* Compl. at 1–2.) The County Defendants argue that any claims against County departments are unnecessary and should be dismissed as duplicative of the claims against the County. (Doc. 27 at 7.) They are correct. "Generally, governmental sub-units are not separate suable entities that may be sued under § 1983." *Hinton v. Dennis*, 362 F. App'x 904, 907 (10th Cir. 2010) (citing *Martinez v. Winner*, 771 F.2d 424, 444 (10th Cir. 1985)). Plaintiffs do not disagree. (*See* Doc. 52 at 17.)

Finally, the County Defendants assert that any federal claims against County officials or

employees represent claims against the County itself and should be dismissed as duplicative. Suits against a defendant in an official capacity "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)). "Damages awarded against a defendant in his official capacity are only recoverable against the governmental entity itself." *Mays v. Bd. of Cnty. Comm's of Cnty. of Lincoln*, No. 09-CV-662 WJ/KBM, 2010 WL 11626655, at *5 (D.N.M. Mar. 26, 2010). "Where a plaintiff chooses to sue both the municipality and the municipal officials in their official capacities, courts routinely dismiss the official capacity claims as redundant." *Id.* at *6 (citations omitted). Thus, the Court will dismiss any § 1983 claims against County officials or employees in their official capacities where the County is also named: *i.e.*, in the Fourth, Thirty-Third, Thirty-Fourth, Thirty-Fifth, and Thirty-Sixth claims.[5]

In any proposed amended complaint, Plaintiffs shall (1) name the correct County entity and substitute the County for all non-suable departments, and (2) omit these claims as brought against County officials and employees in their official capacities.

## IV.   Plaintiffs' Thirty-Third through Thirty-Sixth Claims

### A.   Thirty-Third Claim: Unconstitutional Seizure and Inverse Condemnation

Plaintiffs assert that certain County Defendants violated their state and federal constitutional rights by issuing (or ratifying the issuance of) the Stop Work Order without an inspection of the space, a description of any claimed violation of the law, or a showing of probable cause. (*See* Compl. ¶¶ 699–702.) They claim that "[t]he Stop Work Order . . . unlawfully and

---

[5] Plaintiffs summarily assert that "[s]tate officials sued in their official capacity for injunctive relief are persons for purposes of § 1983." (Doc. 52 at 19 (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989)).) It does not appear, however, that Plaintiffs seek injunctive relief for the relevant claims. Plaintiffs seek attorneys' fees and costs, loss of business opportunity, and continuing lost revenue in count Four (*see* Compl. ¶ 397); "damage" in count Thirty-Three (*id.* ¶ 713); compensatory damages, lost revenue, attorneys' fees, and interest in count Thirty-Four (*id.* ¶ 720); "ongoing damage" in count Thirty-Five (*id.* ¶ 730); and "damage and costs" in count Thirty-Six (*id.* ¶ 739).

unconstitutionally seized (inversely condemned) Plaintiffs['] property." (*Id.* ¶ 704.) It appears that Plaintiffs purport to state claims for an unconstitutional seizure under the Fourth and Fourteenth Amendments and for inverse condemnation under the Fifth and Fourteenth Amendments.[6] (*See id.* ¶¶ 697–713.)

### 1.    Plaintiffs fail to state a federal claim for unconstitutional seizure.

"A 'seizure' of property . . . occurs when 'there is some meaningful interference with an individual's possessory interests in that property.'" *Santana v. City of Tulsa*, 359 F.3d 1241, 1244 (10th Cir. 2004) (quoting *Soldal v. Cook Cnty.*, 506 U.S. 56, 61 (1992)). "[V]iolation of the Fourth Amendment requires an intentional acquisition of physical control." *Est. of Bleck ex rel. Churchill v. City of Alamosa, Colo.*, 540 F. App'x 866, 870 (10th Cir. 2013) (quoting *Brower v. Cnty. of Inyo*, 489 U.S. 593, 596 (1989)). Defendants argue that Plaintiffs have not alleged facts to show that the Stop Work Order constituted a seizure for purposes of the Fourth Amendment. (Doc. 27 at 5–6.)

Plaintiffs respond that there were two relevant seizures: (1) the reversal of the first permit after it had been issued and the work completed (*see* Compl. ¶¶ 122–23; Doc. 52 at 3); and (2) the placement of the Stop Work Order at the space (*see* Compl. ¶¶ 145–58; Doc. 52 at 4). Yet, these allegations do not demonstrate that Defendants acquired *physical control* over the property. *See Est. of Bleck*, 540 F. App'x at 870. Rather, the crux of this claim is that Defendants' conduct impeded Plaintiffs from performing the work necessary to comply with the "open by" provision in the lease. Plaintiffs do not discuss Tenth Circuit authority that requires the "intentional acquisition of physical control" over property to state a Fourth Amendment claim, nor do they offer caselaw to support their position. (*See* Doc. 52 at 3–6.) The Court finds this failure fatal to

---

[6] Plaintiffs cite only the Fourth and Fourteenth Amendments in their Complaint. (*See* Compl. ¶¶ 697–713.)

the claim. *See, e.g.*, *Revis v. Meldrum*, 489 F.3d 273, 280–81 (6th Cir. 2007) ("The State's exercise of physical control over a residence that results in eviction can implicate both Fourth and Fourteenth Amendment protections.") (citing *Soldal*, 506 U.S. at 72 (holding that the physical seizure of a trailer home by police prior to obtaining a lawful eviction order stated a claim for a Fourth Amendment violation); *Thomas v. Cohen*, 304 F.3d 563, 576 (6th Cir. 2002) (concluding that the summary eviction of tenants by the police in contravention of established state eviction procedures supported a claim for a Fourteenth Amendment violation)). The Court dismisses the Thirty-Third claim to the extent Plaintiffs assert a federal claim for an unconstitutional seizure.

### 2. Plaintiffs fail to state a federal claim for inverse condemnation.

Plaintiffs' inverse condemnation claim is based on the same facts as their unconstitutional seizure claim: by impeding Plaintiffs from performing necessary work on the space and delaying the appeals process on the Stop Work Order, the County "inversely condemned Sirphey's leased property." (Doc. 52 at 5.) "The Fifth Amendment's Takings Clause provides that 'private property [shall not] be taken for public use, without just compensation.'" *N. Mill St., LLC v. City of Aspen*, 6 F.4th 1216, 1224 (10th Cir. 2021) (quoting U.S. Const. amend. V). "The Supreme Court has recognized that 'government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster—and that such "regulatory takings" may be compensable under the Fifth Amendment.'" *Id.* (quoting *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 537 (2005)). "The Court has identified two categories of regulatory action that are 'per se' takings: (1) 'where government requires an owner to suffer a permanent physical invasion of her property—however minor,' and (2) 'regulations that completely deprive an owner of "*all* economically beneficial use" of her property.'" *Id.* (quoting *Lingle*, 544 U.S. at 538). At issue here is the second type of action.

The County Defendants argue that Plaintiffs fail to allege facts to show that any County action required Plaintiffs "to sacrifice *all* economically beneficial uses in the name of the common good . . . ." (Doc. 56 at 4 (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 (1992)).) That is, Defendants assert, Plaintiffs fail to allege that "the County Defendants dispossessed Plaintiffs of their leasehold interest or that the [S]top [W]ork [O]rder prevented them from utilizing the premises in any economically beneficial manner." (Doc. 56 at 4.) The Court agrees. The Complaint alleges that Defendants' conduct caused Plaintiffs "damage which is ongoing" (Compl. ¶ 708), but the allegations do not show that the conduct completely deprived Plaintiffs of "*all* economically beneficial use" of the space. *See Lingle*, 544 U.S. at 538. Without such allegations, Plaintiffs' claim fails. The Court dismisses the Thirty-Third claim to the extent Plaintiffs assert a federal claim for inverse condemnation pursuant to the Fifth and Fourteenth Amendments.

### B.      Thirty-Fourth Claim: Equal Protection

Plaintiffs allege that certain County Defendants treated Plaintiffs "differently, unequally[,] and disparately than at least three other similarly situated" businesses. (Compl. ¶ 716.) To state "a 'class of one' equal-protection claim[,]" Plaintiffs must allege that they have "been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *A.M. v. Holmes*, 830 F.3d 1123, 1166 (10th Cir. 2016) (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam)). The County Defendants assert that Plaintiffs fail to show how Boese Bros. was similarly situated to Plaintiffs. (Doc. 27 at 6.) They argue more specifically in their reply brief that Boese Bros. was not similarly situated because it undertook to add a commercial kitchen, which was different from the work Plaintiffs sought to complete. (Doc. 56 at 5.) Defendants make no argument regarding the other two businesses Plaintiffs mention (Fleur de Lys or Smith's). (*See id.*)

Defendants' argument is unpersuasive. With respect to Boese Bros., Plaintiffs allege that the County Defendants treated the two businesses differently in that they allowed Boese Bros. (and not Plaintiffs): (1) to expand and remodel without a permit; (2) to have a free-standing, unattached bar structure without a permit; and (3) to obtain a certificate of occupancy before work was completed. (*Id.* ¶ 716(i)–(iii).) These allegations cover more than the commercial kitchen Defendants reference. The Court denies the motion to dismiss on this basis, and the claim survives.

### C.    Thirty-Fifth Claim: Illegal Search

Plaintiffs allege that when Lovato looked through UnQuarked's window and took photographs without notice, probable cause, or an administrative warrant, she performed an illegal search. (Compl. ¶¶ 721–30.) The County Defendants argue that Plaintiffs fail to state a claim for an illegal search because "there can be no privacy right to those things in plain view of the public, such as a window of a business." (Doc. 27 at 9.)

"Although the Fourth Amendment generally requires officers conduct searches and seizures pursuant to a warrant, their conduct may be justified under the 'plain' view exception." *United States v. Castorena-Jaime*, 285 F.3d 916, 924 (10th Cir. 2002)) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971)).

> An officer may seize evidence of a crime without a warrant if three conditions are met: (1) "the seizing officer must not have violated the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed"; (2) "the item must not only be in plain sight, but its incriminating character must also be immediately apparent"; and (3) the officer must "have a lawful right of access to the object."

*United States v. Benoit*, 713 F.3d 1, 11 (10th Cir. 2013) (quoting *United States v. Naugle*, 997 F.2d 819, 822 (10th Cir. 1993)). Plaintiffs argue that "Lovato had no right to peer through the window of the locked premises on private property and take photographs of the space." (Doc. 52 at 15.)

Defendants reply that Plaintiffs cite no authority to support a finding that "Lovato 'had no

right' to be at the premises" or to take pictures through the window. (Doc. 56 at 8.) The Court sides with Defendants. Plaintiffs cite no authority to demonstrate that they had an expectation of privacy in a space that is viewable from a public window. *See Ortiz v. New Mexico*, 550 F. Supp. 3d 1020, 1117 (D.N.M. 2021) ("[T]he Fourth Amendment protects people, not places. What a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection.") (quoting *Katz v. United States*, 389 U.S. 347, 351 (1967)). Nor do Plaintiffs cite authority to show that Lovato was precluded from taking photographs of publicly viewable space. As a result, the Court dismisses the Thirty-Fifth claim to the extent Plaintiffs assert a federal claim for illegal search.

### D.   Thirty-Sixth Claim: Discrimination under § 1983

Plaintiffs allege that certain County Defendants discriminated against Jain because of his national origin in violation of his equal protection rights under the Fourteenth Amendment.[7] (Compl. ¶¶ 735–36.) They believe that Defendants' conduct was "part of a pattern of delay, indifference[,] and harassment experienced by other similarly situated minorities in the" County. (*Id.* ¶ 737.) "Generally, to state a claim under § 1983 for violation of the equal-protection clause, the plaintiff must show that he or she is a member of a class of individuals that is being treated differently from similarly situated individuals that are not in that class." *Schaefer v. Las Cruces Pub. Sch. Dist.*, 716 F. Supp. 2d 1052, 1066 (D.N.M. 2010).

The County Defendants argue that this claim "is a prime example of a formulaic recitation of the elements of a cause of action[,]" as Plaintiffs allege no facts that would make their equal protection claim plausible. (Doc. 27 at 6.) Plaintiffs contend that the Complaint alleges facts to show disparate treatment (Doc. 52 at 9 (citing Compl. ¶¶ 134–45, 732, 736–37)), but these

---

[7] The Thirty-Sixth Claim also mentions deprivations of rights against unreasonable search and seizure and for due process and equal protection. (*See* Compl. ¶ 732.) As these alleged violations are discussed more thoroughly in the Fourth and Thirty-Third through Thirty-Fifth claims, they appear to be duplicative here.

paragraphs primarily discuss the County's treatment of *UnQuarked* versus other *businesses*. Plaintiffs fail to cite to anything more than conclusory allegations to show that the County Defendants treated *Jain* differently from other *individuals*. (*See id.*) The Court has combed through the Complaint's 745 paragraphs, and it appears that the only other allegation regarding national origin-based discrimination is a conclusory statement that Arellano showed "bias against Jain based upon race bias and/or national origin." (Compl. ¶ 179(v).) This is insufficient to withstand a motion to dismiss. The Court dismisses the Thirty-Sixth claim to the extent Plaintiffs assert a federal claim for discrimination on the basis of national origin.

### E.     Claims Brought under the New Mexico Constitution

Although Plaintiffs cite both federal and state authority in the titles of the foregoing claims (*see* Compl. at 104, 108–09), the County Defendants do not mention the state claims and cite authority that only pertains to the federal claims. (*See* Docs. 27 at 5–6; 56 at 3–6.) Had Defendants done so, it is likely that the Court would have dismissed the state constitutional claims as well. The New Mexico Court of Appeals has affirmed that "there is no private right of action for a plaintiff to vindicate his rights under the New Mexico Constitution." *Cox v. N.M. Dep't of Pub. Safety*, No. CV 06-656 JP/CG, 2007 WL 9733689, at *9 (D.N.M. July 23, 2007) (citing *Barreras v. N.M. Corr. Dep't*, 62 P.3d 770, 776 (N.M. Ct. App. 2002) ("In the absence of affirmative legislation, the courts of this state have consistently declined to permit individuals to bring private lawsuits to enforce rights guaranteed by the New Mexico Constitution, based on the absence of an express waiver of immunity under the Tort Claims Act")). "Because Plaintiff[s] ha[ve] not raised any Tort Claims Act claims for which immunity has been waived" (*see infra* Part VI), it is likely that they "cannot proceed directly with claims based on rights guaranteed by the New Mexico Constitution." *Id.* As Defendants did not raise the issue, however, the Court will not dismiss the

state constitutional claims at this time.

## V.      **Plaintiffs' Fourth Claim**

Plaintiffs assert that certain County Defendants violated their due process rights due to an irregular and insufficient appeals process on the Stop Work Order. (*See* Compl. ¶¶ 379–97.) The County Defendants contend that this claim should be dismissed under the *Colorado River* Doctrine because it is currently being adjudicated in the state court proceeding. (Doc. 27 at 8.) The *Colorado River* abstention doctrine allows "a federal court . . . [to] stay or dismiss a federal suit pending resolution of a parallel state court proceeding." *THI of N.M. at Vida Encantada, LLC v. Lovato*, 848 F. Supp. 2d 1309, 1318 (D.N.M. 2012) (citing *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). "Staying or dismissing the federal case to avoid duplicating a state case serves several purposes, including: 'wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.'" *Potter/Ortiz, LLC v. Lone Mountain Ranch, LLC*, No. CIV 13-1043 RB/RHS, 2014 WL 11497822, at *2 (D.N.M. July 29, 2014) (quoting *Fox v. Maulding*, 16 F.3d 1079, 1081 (10th Cir. 1994)).

"Because the federal courts have a 'virtually unflagging obligation . . . to exercise the jurisdiction given them,' the *Colorado River* doctrine may be used only when 'the clearest of justifications . . . warrant[s] dismissal.'" *THI of N.M. at Vida Encantada, LLC*, 848 F. Supp. 2d at 1318 (quoting *Colo. River*, 424 U.S. at 818–19). "Declining to exercise jurisdiction based on the *Colorado River* doctrine is appropriate only in 'exceptional' circumstances." *Id.* (citing *Colo. River*, 424 U.S. at 818). "Accordingly, this Court's 'task . . . is not to find some substantial reason for the exercise of federal jurisdiction by the federal court; rather, the task is to ascertain whether there exist "exceptional" circumstances, the "clearest of justifications," that can suffice under *Colorado River* to justify the surrender of the jurisdiction.'" *Id.* (quoting *Moses H. Cone Mem'l*

*Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25–26 (1983)).

Courts engage in a two-step analysis to determine whether the circumstances of a case are "exceptional." To begin, the Court "must determine whether the state and federal proceedings at issue are indeed parallel." *Id.* (citing *Fox*, 16 F.3d at 1081). "Suits are parallel if substantially the same parties litigate substantially the same issues in different forums." *Id.* (quoting *Fox*, 16 F.3d at 1081 (internal citation omitted)). If the proceedings are parallel, the Court will then consider the nonexclusive list of factors delineated in *Colorado River* and its progeny "in deciding whether 'exceptional circumstances' exist to warrant such deference . . . ." *Id.* at 1318–19 (quoting *Fox*, 16 F.3d at 1082). Relevant factors include: "the inconvenience of the federal forum; . . . the desirability of avoiding piecemeal litigation; . . . the order in which the courts obtained jurisdiction"; "whether federal law provides the rule of decision"; "the adequacy of the state court action to protect the federal plaintiff's rights"; "whether the party opposing abstention has engaged in impermissible forum-shopping[,]" *id.* at 1319 (quoting *Fox*, 16 F.3d at 1082); and "the vexatious or reactive nature of either action." *Potter/Ortiz, LLC*, 2014 WL 11497822, at *4 (citing *Colo. River*, 424 U.S. at 818; *Moses H. Cone*, 460 U.S. at 18 n.20).

"The Supreme Court has counseled that no single factor is dispositive, but rather, '[t]he weight to be given to any one factor may vary greatly from case to case, depending on the particular setting of the case.'" *THI of N.M. at Vida Encantada, LLC*, 848 F. Supp. 2d at 1319 (quoting *Moses H. Cone*, 460 U.S. at 16). Courts are not to treat "the factors as a 'mechanical checklist,' and instead must engage in 'a careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction.'" *Id.* (quoting *Moses H. Cone*, 460 U.S. at 16). "[T]he Court must resolve any doubt 'in favor of exercising federal jurisdiction.'" *Id.* (quoting *Fox*, 16 F.3d at 1082).

**A.     Whether the Two Actions are Parallel**

Lawsuits "are parallel if substantially the same parties litigate substantially the same issues in different forums." *Id.* at 1318 (quoting *Fox*, 16 F.3d at 1081). Defendants contend that Plaintiffs raise the same issue in the state case—whether the County Defendants violated their due process rights—as they do in their Fourth claim here. (Doc. 27 at 8.) Plaintiffs do not dispute that they are seeking a ruling on the same issue in both courts. (*See* Doc. 52 at 11.) They assert, however, that the Court should not dismiss this matter under the *Colorado River* doctrine because they seek different forms of relief in each court. (*See id.*) In the state proceedings, they seek a reversal of the Board of Appeals' written decision denying Plaintiffs' appeal of the Stop Work Order; here, they seek damages. (*See id.*)

Plaintiffs' argument is unpersuasive. The state court's determination of Plaintiffs' due process claim will be determinative of Plaintiffs' Fourth claim in the federal case. *See AAR Int'l, Inc. v. Nimelias Enters. S.A.*, 250 F.3d 510, 518 (7th Cir. 2001) (explaining that in determining whether two proceedings are parallel, "[t]he question is not whether the suits are formally symmetrical, but whether there is a 'substantial likelihood' that the [state] litigation 'will dispose of all claims presented in the federal case'") (quotation omitted). Plaintiffs acknowledge as much: they admit "the state court's findings and orders may have collateral estoppel effect on some of the factual issues to be tried in this Court . . . ." (Doc. 52 at 11.) The Court finds that Plaintiffs' Fourth claim is parallel to the state court proceedings.

**B.     *Colorado River* Factors**

The Court will next examine each of the relevant factors to decide whether "exceptional circumstances" exist to warrant a stay or dismissal of the federal case.

<u>Inconvenience of Federal Forum</u>: Neither party asserts that the federal form is

inconvenient. This factor is neutral.

Desirability of Avoiding Piecemeal Litigation: "Piecemeal litigation occurs when different tribunals consider the same issue, thereby duplicating efforts and possibly reaching different results." *Am. Int'l Underwriters (Philippines), Inc. v. Cont'l Ins. Co.*, 843 F.2d 1253, 1258 (9th Cir. 1988). Plaintiffs contend that this factor weighs in favor of denial of Defendants' motion, because the state court appeal involves administrative proceedings without possibility of a damages award. (Doc. 52 at 14.) Yet, Plaintiffs seek a determination from the state court on whether the County Defendants violated their due process rights. *See Sirphey LLC*, No. D-132-CV-2021-00002, Statement of Appeals Issues, at *2 (Aug. 29, 2022) (framing one of the issues before the state court as whether the County denied Sirphey its due process rights). The Court finds this factor provides the strongest justification for deference to the state court proceedings, as both courts will be examining the same issues, "thereby duplicating efforts and possibly reaching different results." *Am. Int'l Underwriters (Philippines), Inc.*, 843 F.2d at 1258.

The Order in Which the Courts Obtained Jurisdiction: Plaintiffs acknowledge that Sirphey filed the state administrative court case first. (*See* Doc. 52 at 13.) Defendants assert that because Plaintiffs filed both suits, "this is a repetitive case in which Plaintiffs should be bound by their[] 'initial choice of forum.'" (Doc. 56 at 8 (quoting *Ryder Truck Rental, Inc. v. Acton Foodservices Corp.*, 554 F. Supp. 277 (C.D. Cal. 1983)).) It appears from the state court docket that briefing on Plaintiffs' appeal is almost complete. *See Sirphey*, No. D-132-CV-2021-00002 (1st Jud. Dist. N.M.). With this in mind, the Court finds that this factor falls in favor of abstention.

Whether Federal Law Provides the Rule of Decision: Although the issue is whether the County Defendants violated Sirphey's federal constitutional due process rights, the answer is intricately linked to matters of the County's administrative appeals process. This factor leans

slightly in favor of retaining jurisdiction.

The Adequacy of the State Court Action to Protect Plaintiffs' Rights: Plaintiffs argue that a dismissal or stay would harm them "by preventing Plaintiffs from recovering the damages they have suffered because of the due process violations . . . ." (Doc. 52 at 10.) The Court disagrees: a *stay* will not prevent a recovery of damages. Moreover, the Court finds that the state court is in the best position to consider the due process issue, as it has been involved in this dispute for over a year. The Court finds this factor weighs in favor of abstention.

Forum-Shopping or Vexatious or Reactive Nature of the Actions: The Court finds that Plaintiffs were neither forum-shopping nor acting in a vexatious manner in filing the two actions. As they have pointed out, the state court matter involves the narrow issue of whether the decision on the appeal may be reversed, while the federal matter will decide whether Plaintiffs are entitled to damages. These factors are neutral.

### C.      Balancing the Factors

In balancing the *Colorado River* factors, "[n]o one factor is necessarily determinative[,]" *Colo. River*, 424 U.S. at 818, and "[t]he weight to be given any one factor may vary from case to case . . . ." *Moses H. Cone*, 460 U.S. at 16. Not only should courts favor "the exercise of jurisdiction[,]" but "any doubt in the application and balancing of the factors 'should be resolved in favor of exercising jurisdiction." *Potter/Ortiz, LLC*, 2014 WL 11497822, at *5 (quoting *Fox*, 16 F.3d at 1082). "Only the clearest of justifications will warrant dismissal." *Colo. River*, 424 U.S. at 819. The Tenth Circuit has counseled that rather than dismissing the federal proceedings altogether, "the better practice is to stay the federal action pending the outcome of the state proceedings." *Fox*, 16 F.3d at 1083 (citations omitted).

Here, three factors are neutral. Only one factor—whether federal law provides the rule of

decision—favors retaining jurisdiction. The remaining three factors—avoiding piecemeal litigation, the order the courts obtained jurisdiction, and the adequacy of the state court action—weigh in favor of abstention. After carefully weighing the factors, the Court finds that exceptional circumstances exist that warrant deference to the state court proceedings. Because discovery on Plaintiffs' other claims will overlap with discovery on the due process claim, the Court finds it appropriate to stay the entire federal lawsuit for purposes of efficiency and judicial economy.[8] "Should the state-court proceedings fail to resolve [the due process claim], a stay allows [Plaintiffs] the opportunity to litigate the remaining claims in federal court without requiring [them] to file a new federal action." *Foxfield Villa Assocs., LLC v. Regnier*, 918 F. Supp. 2d 1192, 1205 (D. Kan. 2013) (citing *Fox*, 16 F.3d at 1083). Plaintiffs shall move to lift the stay once there is a final decision in the state court proceedings.

## VI.   State Tort Claims Brought under the New Mexico State Tort Claims Act

Defendants assert (Doc. 27 at 11), and Plaintiffs do not disagree (Doc. 52 at 17–19), that Plaintiffs bring the following claims against the County Defendants pursuant to the New Mexico Tort Claims Act (NMTCA): First through Third (malicious abuse of process); Fifth and Sixth (false representation); Tenth (respondeat superior, vicarious liability, several liability); Eleventh through Sixteenth (negligent supervision and retention); Seventeenth and Eighteenth (ratification); Nineteenth and Twentieth (intentional interference with contractual relations); Twenty-Sixth (principal and agent); Twenty-Ninth (civil conspiracy); and Thirty-Second (civil invasion of privacy by intrusion). (Compl. ¶¶ 364–78, 398–428, 459–578, 631–38, 654–65, 686–96.)

"The NMTCA provides a general grant of immunity from tort claims against government

---

[8] That discovery will overlap is clear, as Plaintiffs' due process claim relies in part on the County Defendants' alleged violations of the state Inspection of Public Records Act and the state Open Meetings Act, which form the bases of Plaintiffs' Seventh through Ninth claims. (*See* Compl. ¶¶ 383(vi), (x), 386, 389, 429–58.)

entities and public employees, unless a particular exception applies." *Mata v. Anderson*, 685 F. Supp. 2d 1223, 1252 (D.N.M. 2010), *aff'd*, 635 F.3d 1250 (10th Cir. 2011) (citing NMSA 1978 § 41-4-4(A)). Moreover, "[t]he [NMTCA] is the exclusive remedy for torts committed by any governmental entity or public employee." *May v. Bd. of Cnty. Comm'rs of Dona Ana Cnty.*, 426 F. Supp. 3d 1013, 1019 (D.N.M. 2019) (citing N.M. Stat. Ann. § 41-4-17). Defendants assert that there is no waiver of immunity for the claims Plaintiffs purport to bring under the NMTCA. (Doc. 27 at 10–11.)

More specifically, Defendants contend that "[t]he only exception that waives immunity for the tort claims asserted by Plaintiffs is the law enforcement officer exception under Section 41-4-12." (*Id.* at 10.) Section 41-4-12 waives immunity for certain enumerated torts, including in relevant part the torts of malicious prosecution, abuse of process,[9] and "privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties." N.M. Stat. Ann. § 41-4-12. Defendants argue that Plaintiffs have named no County Defendant who falls under the definition of a "law enforcement officer." (Doc. 27 at 10–11 (citing N.M. Stat. Ann. § 41-4-3 (defining a law enforcement officer, in relevant part, as one "whose principal duties under law are to hold in custody any person accused of a criminal offense, to maintain public order or to make arrests for crimes")).) Plaintiffs do not disagree, nor do they cite authority to rebut this contention. (*See* Doc. 52 at 17–19.) Instead, Plaintiffs assert that "Defendants cannot shield themselves from suit behind the [NMTCA] after committing state torts against the Plaintiffs where this behavior involved

---

[9] The New Mexico Supreme Court has merged the torts of "malicious prosecution" and "abuse of process" into a single tort—malicious abuse of process. *See DeVaney v. Thriftway Mktg. Corp.*, 953 P.2d 277, 283 (N.M. 1998), *overruled on other grounds by Durham v. Guest*, 204 P.3d 19, 26 (N.M. 2009), *& abrogated on other grounds by Fleetwood Retail Corp. of N.M. v. LeDoux*, 164 P.3d 31, 39–40 (N.M. 2007)).

violations of federal law and/or depravation [sic] of Plaintiff[s'] U.S. Constitutional rights." (*Id.* at 19 (citations omitted).) Plaintiffs' argument misses the mark. Because Plaintiffs fail to establish that any County Defendant is a "law enforcement officer" for purposes of the NMTCA or that their claims fall within an exception enumerated in the NMTCA, the Court will grant the motion to dismiss the claims brought under the NMTCA on this basis.[10]

## VII. Claims Brought under the New Mexico Inspection of Public Records Act and the New Mexico Open Meetings Act

The County Defendants assert that the Court should decline to exercise supplemental jurisdiction over the Seventh through Ninth claims, which are based on violations of the Inspection of Public Records Act (IPRA) and the Open Meetings Act (OMA). (Doc. 27 at 18–19.) They argue that supplemental jurisdiction is not appropriate for two reasons: (1) because the IPRA and OMA claims do not share facts common to those that form the basis of Plaintiffs' federal claims; and (2) because the claims raise novel and complex issues of state law. (*Id.* at 18–20.)

### A. Whether the IPRA and OMA Claims Share Facts Common to the Federal Claims

Pursuant to 28 U.S.C. § 1367(a), because the Court has original jurisdiction over Plaintiffs' federal claims, it also has "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or

---

[10] Defendants also argue that the Tenth through Eighteenth claims, all of which rely on some theory of negligent supervision, ratification, or principal/agent, fail because "one public employee cannot be liable for another public employee's actions based on having general supervisory authority over such employee." (Doc. 27 at 16 (citing *Silva v. New Mexico*, 745 P.2d 380, 385–86 (N.M. 1987)).) Plaintiffs acknowledge that "to name a particular supervisory entity in an action under the Tort Claims Act, a party must show[,]" in part, a negligent public employee *who meets one of the waiver exceptions under the act* . . . ." (Doc. 52 at 24 (citing *Silva*, 745 P.2d at 385) (emphasis added).) Again, Plaintiffs fail to establish any waiver exception under the NMTCA. Thus, any claim based on supervisory liability also fails.

The Court declines to rule on the County Defendants' alternative arguments regarding the statute of limitations and timely notice. (*See* Doc. 27 at 12–15.)

controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). "Federal courts may exercise pendent jurisdiction over state law claims when 'state and federal claims . . . derive from a common nucleus of operative fact.'" *Young v. City of Albuquerque*, 77 F. Supp. 3d 1154, 1183 (D.N.M. 2014) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966)). The County Defendants argue that the IPRA and OMA claims do not derive from the same operative facts as Plaintiffs' federal claims. (Doc. 27 at 19.)

IPRA creates a "right to inspect public records . . . ." N.M. Stat. Ann. § 14-2-1. In their Seventh claim, Plaintiffs allege that certain County Defendants violated IPRA "[b]y denying, impeding[,] and altering the records" Plaintiffs requested pursuant to IPRA. (*See* Compl. ¶¶ 432–33). OMA provides that meetings of state policymaking bodies in which the body takes action within its authority are to be "open to the public at all times, except as otherwise provided in the constitution of New Mexico or [OMA]." *N.M. State Inv. Council v. Weinstein*, 382 P.3d 923, 942 (N.M. Ct. App. 2016) (quoting § 10-15-1(B)). Plaintiffs assert two OMA claims: counts Eight and Nine are based on allegations that the Board violated OMA when it reconvened in closed session in January 2022 to produce written findings and take final action on Plaintiffs' appeal of the Stop Work Order. (*See* Compl. ¶¶ 437–58.)

The County Defendants argue that the IPRA and OMA "claims share no common facts with the Stop Work Order or the administrative appeal that Plaintiffs' federal claims are based on." (Doc. 27 at 19.) Plaintiffs respond that because they made IPRA requests "in furtherance of the appellate process, and the unlawful alterations were made to conceal irregularities during the appeal[,]" the IPRA claim is "clearly related to the federal claims." (Doc. 52 at 28.) Plaintiffs contend that "[t]he OMA claims arise directly from the appeal during which the County [allegedly] violated Plaintiffs' rights[] and are inextricably linked to facts common to the federal claims." (*Id.*)

The Court agrees. The IPRA and OMA claims share facts with Plaintiffs' federal claims, in that the claims are rooted in the County Defendants' conduct during the appeals process of the Stop Work Order. Moreover, the Plaintiffs' due process claim explicitly refers to the alleged IPRA and OMA violations. (*See* Compl. ¶¶ 383(vi), (x), 386, 389.) The Court finds that these state claims are part of the same case or controversy pursuant to § 1367(a).

### B.    Whether the Claims Raise Novel or Complex Issues of State Law

Even where the state claims are part of the same case or controversy, the Court may:

decline to exercise supplemental jurisdiction over a claim under subsection (a) if--
(1) the claim raises a novel or complex issue of State law,
(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
(3) the district court has dismissed all claims over which it has original jurisdiction, or
(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). The County Defendants argue that the IPRA and OMA claims "raise novel or complex issues of state law" because "there is little New Mexico caselaw to provide guidance to the court." (Doc. 27 at 18 (citing *Saavedra v. City of Albuquerque*, 917 F. Supp. 760, 765 (D.N.M. 1994)).)

United States District Judge James O. Browning has found that "a State law issue is novel when it is: (i) new; and (ii) concerns a notable State matter." *Harjo v. City of Albuquerque*, 307 F. Supp. 3d 1163, 1192 (D.N.M. 2018). Judge Browning opined that an issue is not necessarily novel simply "because there are no state court cases interpreting a relevant statute." *Id.* "While such a scenario might be sufficiently new under the first prong of the Court's test, any given State statute does not necessarily concern a sufficiently notable State matter." *Id.* at 1192–93. "If, for example, statutory interpretation would require the [C]ourt only to determine the rights or duties between

private parties, such as when the Court is interpreting a statute like the Uniform Commercial Code, the Court is less likely to find the issue a notable State matter." *Id.* "If, on the other hand, the outcome of the Court's statutory interpretation would greatly affect the balance of power between State and local authorities, the Court is more likely to determine that a matter is notable." *Id.*

### 1.    IPRA Claim

Defendants argue that the IPRA claim is novel because the Court must "engage in statutory interpretation and predict how the New Mexico Supreme Court would rule on the claim." (Doc. 27 at 18.) Defendants cite one relevant case in support. In *Cox v. New Mexico Department of Public Safety*, the plaintiff was terminated from a government agency and alleged that an agency employee violated IPRA by refusing to provide him with documents, presumably related to his termination. *See* No. CV 06-656 JP/CG, 2007 WL 9733689, at *1, 9 (D.N.M. July 23, 2007). The court opined that the "IPRA claim present[ed] a number of novel issues which have not been thoroughly developed in New Mexico case law." *Id.* at *9. The court cited to a state appellate case, which "suggest[ed] that 'determin[ing] penalties for compliance [with IPRA] after a lawsuit is filed' presents a novel question under New Mexico law." *Id.* (quoting *Derringer v. New Mexico*, 68 P.3d 961, 964 (N.M. Ct. App. 2003)). The court found that it "would be required to engage in statutory interpretation and may be called on to predict how the New Mexico Supreme Court would rule on [the IPRA] claim." *Id.* (citation omitted).

Critically, this is *not* the basis on which the court declined to exercise supplemental jurisdiction. *See id.* Instead, the court declined to exercise supplemental jurisdiction because the "[p]laintiff's federal claims [had] already been disposed of" on summary judgment. *See id.* Thus, *Cox* does not stand for the proposition that a federal court should not hear an IPRA claim where related federal claims remain. *See id.* Moreover, the *Cox* plaintiff's IPRA claim is not on all fours

with Plaintiffs' IPRA claim here. Whereas the *Cox* plaintiff requested access to documents from the government agency he worked for, Plaintiffs requested documents from the County concerning its "records and communications regarding the façade of [the] Mari Mac . . . ." (Compl. ¶ 354.) The Court declines to dismiss the IPRA claim pursuant to § 1367(c) at this time.

### 2. OMA Claims

In their Eighth and Ninth claims, Plaintiffs allege that the County Defendants violated the OMA when they took formal action on Plaintiffs' appeal (on remand from the state court) during closed hearings. (Compl. ¶¶ 437–58.) Defendants cite *Saavedra v. City of Albuquerque*, 917 F. Supp. 760 (D.N.M. 1994), to support a finding that the OMA claims are novel or complex. (Doc. 27 at 19.) Although the *Saavedra* court did find that "little or no New Mexico caselaw exists to provide guidance" with respect to the plaintiff's OMA claim, it also ultimately dismissed the state law claims because it disposed of all federal claims on summary judgment. *See* 917 F. Supp. at 765. Since *Saavedra*, New Mexico state courts have had a variety of opportunities to examine claims brought under OMA. Thus, the Court will not be required to examine Plaintiffs' claims without any guidance. At this juncture, the Court declines to dismiss the OMA claims on the basis that they are novel or complex.

## VIII. Quasi-Judicial Immunity

Finally, the County Defendants argue that the individual members of the Board and the Council, including their attorney, are entitled to quasi-judicial immunity. (Docs. 27 at 20; 56 at 6–7.) "Absolute immunity has long been available to protect judges from liability for acts performed in their judicial capacity. *Dahl v. Charles F. Dahl, M.D., P.C. Defined Ben. Pension Tr.*, 744 F.3d 623, 630 (10th Cir. 2014) (citing *Cleavinger v. Saxner*, 474 U.S. 193, 199 (1985)). "Over time the defense has been extended to 'certain others who perform functions closely associated with the

judicial process.'" *Id.* (quoting *Cleavinger*, 474 U.S. at 200). The defense "is often called quasi-judicial immunity when it is applied to someone other than a judge." *Id.* (citations omitted).

"A court must engage in a functional analysis of an official's conduct to determine whether it is quasi-judicial in nature, and whether absolute immunity attaches." *Gilchrist v. Citty*, 71 F. App'x 1, 5 (10th Cir. 2003) (citing *Burns v. Reed*, 500 U.S. 478, 512 (1991)). In making this determination, courts consider the following factors:

> (a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal.

*Cleavinger*, 474 U.S. at 202 (citation omitted). "The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." *Thomas v. Kaven*, 765 F.3d 1183, 1193 (10th Cir. 2014) (quoting *Burns*, 500 U.S. at 486–87). Thus, "[a]bsolute immunity is recognized only sparingly, and officials seeking the immunity bear the burden of showing that their actions are entitled to such absolute protection." *Gilchrist*, 71 F. App'x at 5 (citing *Burns*, 500 U.S. at 486–87)). Here, the factors weigh against absolute immunity.

The Need to Perform Functions Without Harassment or Intimidation: The first factor weighs in Defendants' favor, as Plaintiffs acknowledge that the County and its "boards may need to be sheltered from intimidation to perform their functions." (Doc. 52 at 29 (emphasis omitted).)

The Presence of Safeguards: The County Defendants do not mention any procedural safeguards that reduce the need for private damages. (*See* Docs. 27 at 20; 56 at 6–7.) Conversely, the Complaint details denials of safeguards that exist in judicial proceedings. For example, Plaintiffs allege that the Board: purposely delayed proceedings; arbitrarily restricted Sirphey's questioning of witnesses; removed the requirement for written findings; prevented Sirphey from

impeaching opposing witnesses; and "applied a double standard to the admission of evidence" that disadvantaged Sirphey. (*See* Compl. ¶ 285.) This factor weighs heavily against a finding of quasi-judicial immunity. *See Brunson v. Murray*, 843 F.3d 698, 712 (7th Cir. 2016) (finding that "notice, a prompt public hearing on an official record, and a reasoned written decision" are "substantial procedural safeguards").

Insulation from Political Influence: Members of the Council were elected representatives, and at least two members of the Board were *also* elected Council members. (*See, e.g.*, *id.* ¶¶ 5, 12, 46, 54, 217, 231.) Moreover, Plaintiffs allege facts to show that members of the Board and Council were not "free from pressures by parties or other officials within the agency[,]" *Butz v. Economou*, 438 U.S. 478, 513 (1978), as some individuals were actively lobbying for the redevelopment of the Mari Mac, a project that would have been impeded by UnQuarked's successful opening. (*See, e.g.*, Compl. ¶¶ 217–18, 232–33.) This factor weighs against immunity.

The Importance of Precedent: Defendants summarily state that the Board and Council "were setting precedent for future Stop Work Order appeals . . . ." (Doc. 27 at 20.) Plaintiffs do not disagree. (*See* Doc. 52 at 29–30.) Yet, Plaintiffs allege "that the Board had never in its history adopted a" Procedural Scheduling Order similar to the one used for Sirphey's appeal. (Compl. ¶ 211.) This suggests that precedent was "not a controlling factor." *See Da Vinci Inv., Ltd. P'ship v. Parker*, 622 F. App'x 367, 374 (5th Cir. 2015). This factor does not weigh firmly on either side.

The Adversary Nature of the Process: Without citing relevant authority, Defendants state that both the Board and the Council "were tasked with conducting adversary hearings . . . ." (Doc. 27 at 20.) Again, however, Plaintiffs allege that the hearings were not traditionally adversarial, as Sirphey was prevented from impeaching any witness. (*See* Docs. 52 at 30; Compl. ¶ 285(viii).) This factor weighs against immunity.

The Correctability of Error on Appeal: The Court finds it problematic that the Council, which was responsible for hearing appeals from the Board, at times shared members *with* the Board. Defendants assert that the relevant decisions "are appealable to the New Mexico state courts." (Doc. 27 at 20.) Plaintiffs contend that as a practical matter, any "error is not easily correctable on appeal, because the Board['s] conduct has led the Plaintiffs to lose their lease." (Doc. 52 at 30.) At this time, the Court finds this factor weighs against immunity.

On balance, the Court finds that the factors weigh against extending quasi-judicial immunity to the individual County Defendants. They are still entitled, however, "to claim the protection of qualified immunity." *See Mee v. Ortega*, 967 F.2d 423, 428 (10th Cir. 1992).

## IX.    Claims Against the Central Park Defendants

Plaintiffs bring three claims (Twenty-Third, Twenty-Fifth, and Twenty-Eighth) against the Central Park Defendants (Kunsberg, Salazar, and CPS). The facts relevant to the claims are as follows. UnQuarked originally leased space in the CPS shopping center. (*Id.* ¶ 13.) According to the Complaint, Salazar was friends with Arellano and a "confederate" of Boese Bros. (*Id.* ¶¶ 79–82.) Boese Bros. told Salazar and Kunsberg that it wanted to move into UnQuarked's space at CPS. (*Id.* ¶ 84.) Sometime thereafter, UnQuarked's lease renewal was subjected to "untenable new terms[,]" and before Plaintiffs could decide on renewal, they were "told that there would be a new tenant." (*Id.* ¶¶ 85–87.) Salazar then "openly demonstrated animosity and contempt for Jain by" making "disparaging" comments about Jain to Arellano and "disseminating negative information about UnQuarked and Sirphey to Boese Bros. and Kunsberg." (*Id.* ¶ 88.) Salazar and Kunsberg allegedly posted "signs at CPS that suggested UnQuarked was going out of business." (*Id.* ¶¶ 88, 627, 651.) Salazar also allegedly disclosed terms of Sirphey's Mari Mac lease to others. (*Id.* ¶ 603.)

The Central Park Defendants move to dismiss the claims on several grounds. In their response, Plaintiffs admit that their Twenty-Fifth claim, entitled "Principal and Agent" (*see* Compl. ¶¶ 620–30), is not a recognized cause of action. (Doc. 63 at 10.) Consequently, the Court will grant the motion on this issue and dismiss the Twenty-Fifth claim. Plaintiffs also admit that Jain and Nucklos lack standing to bring claims on behalf of Sirphey. (*Id.* at 5.) The Court will examine the remaining two claims in more detail.

### A. The Court declines to dismiss on the basis that the claims are untimely.

In the Twenty-Third claim, Plaintiffs allege that Salazar, individually and as agent of Kunsberg and CPS, intentionally interfered with Sirphey's leases. (Compl. ¶¶ 600–08.) In the Twenty-Eighth claim, Plaintiffs allege that the Central Park Defendants conspired with others to cause UnQuarked's restaurant at the Mari Mac to fail. (*Id.* ¶¶ 646–53.) The Central Park Defendants first argue that these claims are subject to the three-year statute of limitations found in N.M. Stat. Ann. § 37-1-8. (Doc. 43 at 5.) Plaintiffs assert that the four-year statute of limitations in § 37-1-4, which applies to "all other actions not herein otherwise provided for and specified[,]" applies. (Doc. 63 at 2.) The Court finds that § 37-1-8 applies to both claims.

A cause of action for tortious interference with contractual relations sounds in tort. *See El Dorado Utils., Inc. v. Eldorado Area Water & Sanitation Dist.*, 109 P.3d 305, 310 (N.M. Ct. App. 2005). Plaintiffs' claim for civil conspiracy also appears to be grounded in tort.[11] "In New Mexico,

---

[11] A claim for civil conspiracy may be grounded in tort or fraud. *See Roberts v. Generation Next, LLC*, 853 F. App'x 235, 242 (10th Cir. 2021). "To establish a civil conspiracy, a plaintiff must show: (1) that a conspiracy between two or more individuals existed; (2) that specific wrongful acts were carried out by the defendants pursuant to the conspiracy; and (3) that the plaintiff was damaged as a result of such acts." *Davis v. Gardner Turfgrass, Inc.*, No. 15 CV 743 JAP/WPL, 2016 WL 5172820, at *15 (D.N.M. July 29, 2016) (citing *Vigil v. Pub. Serv. Co. of N.M.*, 94 P.3d 813, 817 (N.M. Ct. App. 2004)). It does not appear from their Complaint or from their briefing on this motion that Plaintiffs allege any facts or advance any argument to support a finding that Defendants conspired to commit fraud. *See Williams v. Stewart*, 112 P.3d 281, 290 (N.M. Ct. App. 2005) (outlining the elements of a fraud claim).

tort claims are generally subject to a three-year statute of limitations . . . ." *Nowell v. Medtronic Inc.*, 372 F. Supp. 3d 1166, 1219 (D.N.M. 2019), *aff'd*, No. 19-2073, 2021 WL 4979300 (10th Cir. Oct. 27, 2021) (citing N.M. Stat. Ann. § 37-1-8; *Badilla v. Wal-Mart Stores E. Inc.*, 357 P.3d 936, 937 n.1 & 948 (N.M. 2015) ("While we acknowledge that Section 37-1-8 refers to actions for personal injuries without explicit reference to tort claims, this statute governs general tort claims.")). Accordingly, the Court applies § 37-1-8's three-year statute of limitations to both claims.

The Central Park Defendants contend that "[t]he latest date for any of the factual allegations against Salazar is a reference to a non-actionable April 25, 2019 email from Salazar to Arellano" regarding Salazar's past interactions with Jain. (Doc. 43 at 5 (citing Compl. ¶ 88(ii)).) They argue that because the "email was sent over three years prior to the" date Plaintiffs filed their Complaint, these claims are barred by the statute of limitations. (*See id.*) Plaintiffs respond that their claims did not accrue on the date Salazar sent the email, but on the date they discovered or should have discovered their claims. (Doc. 63 at 3.[12]) *See also Williams v. Stewart*, 112 P.3d 281, 285 (N.M. Ct. App. 2005) (noting that a "cause of action accrues when the plaintiff discovers or with reasonable diligence should have discovered that a claim exists") (quoting *Roberts v. Sw. Cmty. Health Servs.*, 114 N.M. 248, 255–56, 837 P.2d 442, 449 (N.M. 1992)).

Defendants do not disagree that Plaintiffs' claims accrued when they discovered them, but they contend that Plaintiffs "offer nothing to establish, nor do they affirmatively assert, they learned of [Salazar's] email at a date that would make the Complaint timely." (Doc. 67 at 3.) Yet,

---

[12] Plaintiffs cite to *Badilla* for the proposition that a "cause of action accrues when the breach is or should have been discovered." (Doc. 63 at 3 (citing 357 P.3d at 942).) *Badilla* is inapposite, as the court there was looking at a claim for breach of warranty brought under the UCC and subject to the statute of limitations in N.M. Stat. Ann. § 55-2-725. *See* 357 P.3d at 942.

Salazar's email is not the only conduct on which these claims are based. Plaintiffs assert that the Central Park Defendants spread negative information, posted signs about UnQuarked, and disclosed the lease terms to Arellano. The Complaint does not offer dates for the alleged conduct. "The determination of whether a claim is timely filed is a question of fact, and only becomes a question of law when there is no factual dispute." *Slusser v. Vantage Builders, Inc.*, 306 P.3d 524, 528 (N.M. Ct. App. 2013) (quoting *Ocana v. Am. Furniture Co.*, 91 P.3d 58, 65 (N.M. 2004)). Reading the Complaint in a light most favorable to Plaintiffs, the Court finds it plausible that they did not discover their possible claims against the Central Park Defendants until after the first set of hearings in June 2020, within three years of the date they filed this lawsuit. The Court declines to dismiss on this basis.

### B.    Twenty-Third Claim: Intentional Interference with Contractual Relations

Plaintiffs allege that Salazar tortiously interfered with two contracts: Sirphey's lease with CPS and Sirphey's lease with Smith's for the Mari Mac space. (*See* Compl. ¶¶ 602–04.) The parties agree that to plead a cause of action for tortious interference with a contractual relationship, Plaintiffs must allege facts to show: "(i) the defendant had knowledge of existing contracts; (ii) the contracts were breached; (iii) the defendant played an active and substantial part in causing the plaintiff to lose the benefits of the contract; (iv) damages flowed from the breached contract; and (v) the defendant induced the breach without justification or privilege." *Horizon AG-Prod. v. Precision Sys. Eng'g, Inc.*, No. CIV 09-1109 JB DJS, 2010 WL 4054131, at *5 (D.N.M. Sept. 28, 2010) (citing *Wolf v. Perry*, 339 P.2d 679, 681–82 (N.M. 1959); *Ettenson v. Burke*, 17 P.3d 440, 446 (N.M. Ct. App. 2001)). The Court finds that Plaintiffs have failed to state a claim.

Regarding Sirphey's lease with CPS, Plaintiffs allege that Salazar interfered with UnQuarked's business by allowing tours of its space at CPS with prospective new tenants without

notice and attempting to post signs at CPS that UnQuarked was going out of business. (*Id.* at 8 (citing Compl. ¶¶ 88(i), (vi), 602).) Plaintiffs fail to clearly assert any facts or mount any argument to show that the CPS contract was breached or that Salazar's conduct resulted in damages. (*See* Docs. 63 at 8–9; 67 at 4.) The Court grants the motion to dismiss to the extent that this claim is based on Sirphey's lease with CPS.

With respect to the Mari Mac lease, the Central Park Defendants contend that Plaintiffs fail to allege facts to meet the third or fifth elements—that their conduct played a part in causing the loss of Sirphey's lease or that they induced the breach of the lease. (Docs. 43 at 9; 67 at 4.) The Court agrees. In *Array Technologies, Inc. v. Mitchell*, for example, the plaintiff (ATI) alleged that a former employee (Mitchell) violated a nondisclosure agreement when he resigned from his position and went to work for an ATI competitor. *See* 305 F. Supp. 3d 1256, 1262–68 (D.N.M. 2018). In its tortious interference claim, ATI alleged "that prior to Mitchell's resignation, the [competitor] recruited Mitchell and agreed to help with his legal costs despite their knowledge that his employment with [the competitor] would violate . . . the NDA." *Id.* at 1274. ATI further alleged that after Mitchell resigned, the competitor "continued to induce Mitchell to violate the confidentiality provisions of the NDA by urging him to disclose confidential information to help [the competitor's] sales efforts . . . ." *Id.* The court found that these allegations were adequate to state a claim for tortious interference. *Id.*

Here, Plaintiffs advance one relevant fact to show the Central Park Defendants' involvement in the Mari Mac lease: they allege that Salazar[13] and Arellano interfered with Sirphey's Mari Mac lease by discovering and disclosing the "open-by" provision "to unauthorized

---

[13] Plaintiffs vaguely allege that Kunsberg knew about and/or approved of Salazar's conduct. (*See, e.g.*, Compl. ¶ 651(f), (j).)

Case 1:22-cv-00465-RB-LF   Document 76   Filed 01/11/23   Page 38 of 40

persons with the intent to harm Plaintiffs." (*Id.* (citing Compl. ¶¶ 565, 603, 651(c), 693).) Even if this conduct was "active and substantial" (a finding of which the Court is not convinced), Plaintiffs fail to show how it induced Smith's to breach the Mari Mac lease. (*See* Doc. 63 at 9–10.) Plaintiffs allege that Smith's breached the lease by failing to refurbish the façade of the Mari Mac, by denying Sirphey quiet enjoyment of the space, and by breaking into, trespassing on, and vandalizing the space. (*See* Compl. ¶¶ 740–45.) Plaintiffs fail to show that the Central Park Defendants' conduct in disclosing the lease's "open-by" provision induced Smith's to breach the lease. The Court grants the motion to dismiss the Twenty-Third claim.

### C.    Twenty-Eighth Claim: Civil Conspiracy

In their Twenty-Eighth claim, Plaintiffs allege that the Central Park Defendants, together with Waller (an agent of Smith's) and Boese Bros., acted together in a civil conspiracy for the purpose of forcing UnQuarked's closure. (*Id.* ¶¶ 646–53.) To state a claim for civil conspiracy, Plaintiffs must "demonstrate '(1) that a conspiracy between two or more individuals existed; (2) that specific wrongful acts were carried out by the defendants pursuant to the conspiracy; and (3) that the plaintiff was damaged as a result of such acts.'" *Ettenson*, 17 P.3d at 445 (quoting *Silva v. Town of Springer*, 912 P.2d 304, 310 (N.M. Ct. App. 1996)). "[A] civil conspiracy by itself is not actionable, nor does it provide an independent basis for liability 'unless a civil action in damages would lie against one of the conspirators.'" *Id.* (quoting *Armijo v. Nat'l Sur. Corp.*, 268 P.2d 339, 347 (N.M. 1954)). The Central Park Defendants contend that the claim should be dismissed because Plaintiffs fail to assert an independent civil action against them. (Doc. 43 at 10–11.) Plaintiffs respond that "the claim underlying the derivative claim of conspiracy is Intentional Interference with Contractual Relations." (Doc. 63 at 10 (emphasis omitted).) Because the Court has dismissed this claim, it may not form the basis of the claim for civil conspiracy. *See Ettenson*,

17 P.3d at 445 ("A civil conspiracy must actually involve an independent, unlawful act that causes harm—something that would give rise to a civil action on its own.") (citation omitted). Accordingly, the Court grants the motion to dismiss the Twenty-Eighth claim.

## X.    Conclusion

The Court dismisses the federal portions of the Thirty-Third (unconstitutional seizure/inverse condemnation), Thirty-Fifth (illegal search), and Thirty-Sixth (discrimination under § 1983) claims for failure to state a claim. The state law portion of the claims remain.

The Court dismisses the following state claims on the basis that Plaintiffs failed to establish a waiver of immunity under the NMTCA: First through Third (malicious abuse of process); Fifth and Sixth (false representation); Tenth (respondeat superior, vicarious liability, several liability); Eleventh through Sixteenth (negligent supervision and retention); Seventeenth and Eighteenth (ratification); Nineteenth and Twentieth (intentional interference with contractual relations); Twenty-Sixth (principal and agent); Twenty-Ninth (civil conspiracy); and Thirty-Second (civil invasion of privacy by intrusion). (Compl. ¶¶ 364–78, 398–428, 459–578, 631–38, 654–65, 686–96.)

The Court dismisses the Twenty-Third (intentional interference with contractual relations), Twenty-Fifth (principal and agent), and Twenty-Eighth (civil conspiracies) claims against the Central Park Defendants.

This matter is stayed pending a final decision in the state-court proceedings. Plaintiffs shall move to lift the stay within **ten days** of such decision.

Plaintiffs allude to their intent to file a motion to amend the complaint. (*See, e.g.*, Doc. 52 at 17.) Plaintiffs shall file their motion within **14 days** after the stay in this matter is lifted. The proposed amended complaint shall, at a minimum, correct the name of the County, substitute the

County for the incorrectly named County entities, and omit the federal claims brought against County officials and employees in their official capacities.

**THEREFORE,**

**IT IS ORDERED** that the Motion to Dismiss of Defendant Board of County Commissioners of the Incorporated County of Los Alamos (Doc. 27) is **GRANTED IN PART** and **DENIED IN PART** as described herein;

**IT IS FURTHER ORDERED** that Defendants Central Park Square, Philip Kunsberg, and Terry Salazar's Motion to Dismiss (Doc. 43) is **GRANTED**;

**IT IS FURTHER ORDERED** that this matter is **STAYED** pending a final decision in the related state-court proceedings. Plaintiffs shall file a motion to lift the stay within **ten days** of such decision;

**IT IS FURTHER ORDERED** that Plaintiffs shall move to amend the complaint within **14 days** after the stay in this matter is lifted.

_____
ROBERT C. BRACK
SENIOR U.S. DISTRICT JUDGE