**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

**PRASHANT JAIN**, an individual & Managing Director of Sirphey L.L.C.;

**CORTNI NUCKLOS,** Communications Director/Officer for Sirphey L.L.C.;

**SIRPHEY L.L.C.**, a domestic limited liability company.

*Plaintiffs*,

Case No. 1:22-cv-00465

**v.**

**MICHAEL ARELLANO,** individually,

**PAUL ANDRUS**, individually;

**BOARD OF THE COUNTY COMMISSIONERS OF THE INCORPORATED COUNTY OF LOS ALAMOS**, the governing body of the incorporated County of Los Alamos;

**HARRY BURGESS**, individually;

**J. ALVIN LEAPHART**, individually,

**BARBARA RICCI** in her official capacity as designated records custodian of the Records Information Management Office for the incorporated County of Los Alamos;

**RANDALL RYTI,** individually,

**SARA SCOTT**, individually,

**TERRY PRIESTLEY**, individually,

**PHILO SHELTON,** individually,

**SMITH'S FOOD & DRUG CENTERS, INC.**, a foreign, for-profit corporation incorporated in Ohio;

**PRIORITY PROPERTIES,** is a Missouri company operating in New Mexico whose corporate status in New Mexico is uncertain;

**STEVE WALLER,** individually and in his capacity as maintenance custodian of the Mari Mac Shopping Center and as an agent of Priority Properties

*Defendants.*

---

## AMENDED COMPLAINT

COME NOW the Plaintiffs, Prashant Jain, Cortni Nucklos, and Sirphey, L.L.C., by and through their undersigned attorneys, and hereby submit their Amended Complaint against the Defendants for damages caused by violation of their constitutional rights under the U.S. Constitution, federal law, the statutes of the State of New Mexico, the Los Alamos County Code of Ordinances ('LACCO'), and various common law violations further described below.

### I. Parties

1. Defendant Michael Arellano ("Arellano") was, at all relevant times, acting in the capacity of the Chief Building Official ("CBO") for the incorporated County of Los Alamos.

2. Defendant Paul Andrus ("Andrus") is the Director of Community Development for Los Alamos County.

3. Defendant Harry Burgess ("Burgess") was, at all relevant times, Manager of CLA, and served as a member of the Board.

4. Defendant Board of the County Commissioners of the Incorporated County of Los Alamos is a public body pursuant 42 USC 1983 et. seq. and §§ 10-15-1 NMSA 1978 et. seq. It is the appropriate body to be sued in place of its various subdivisions and departments. Accordingly, where Plaintiffs allege a party is an employee of the Board of the County Commissioners of the Incorporated County of Los Alamos, it is to signify that said party is an employee of a subdivision

or department, or other entity controlled by the Board of the County Commissioners of the Incorporated County of Los Alamos.

5. Plaintiff Prashant Jain ("Jain") is an individual and resident of Los Alamos County, New Mexico, and is the owner of Sirphey, LLC.

6. Defendant Smith's Food and Drug ("Smith's") was at all relevant times the owner of and landlord of the Mari Mac Shopping Center. Smith's is owned by Kroger.

7. Defendant J. Alvin Leaphart ("Leaphart") is the County Attorney for the CLA, and served as attorney for the Boards and the Council at all relevant times.

8. Plaintiff Cortni Nucklos ("Nucklos") is an officer of Sirphey, LLC.

9. Defendant Priority Properties ("Priority") is a realty company involved with managing the Mari Mac.

10. Defendant Sara Scott ("Scott") was, during relevant periods, Chairperson of the Council and also Chair of the Board.

11. Plaintiff Sirphey LLC ("Sirphey") is a domestic limited liability company.

12. Defendant Philo Shelton ("Shelton") is an employee of the CLA and was a member of the Board at all relevant times.

13. Defendant Barb Ricci ("Ricci") is the designated records custodian for the Board of the County Commissioners of the Incorporated County of Los Alamos.

14. Defendant Randal Ryti ("Ryti") was at all relevant times a member of the Council and of the Board.

15. Defendant Steve Waller ("Waller") is an agent of Priority and Smith's, and is the owner of a local plumbing company.

## II. Jurisdiction and Venue

16. Plaintiffs restate and reallege the allegations of Paragraphs 1-20 above as if fully set out herein.

17. Jurisdiction over the subject matter is conferred by 28 U.S.C. § 1331, 42 U.S.C. §§ 1983 & 1988. Pendant jurisdiction over state claims is conveyed by 28 U.S.C. § 1391(b)(2).

18. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the acts complained of occurred within Los Alamos County, New Mexico.

## III. Factual Allegations

19. Plaintiffs restate and reallege the allegations of Paragraphs 1-18 above as if fully set out herein.

20. This matter arises out of the issuance of a Stop Work Order ("red tag") on the Plaintiffs' leasehold premises at 813 Central Avenue, in Los Alamos, New Mexico, in the Mari Mac Village Shopping Center (the "Mari Mac"). That red tag was placed on November 21, 2019.

21. Defendant Arellano and Defendant Board of the County Commissioners of the Incorporated County of Los Alamos violated and denied the due process rights of the Plaintiffs. *See* EXHIBIT 1, Final Decision on Plaintiff Appellant's Appeal, *Sirphey, LLC v. Board of The County Council of Los Alamos County*, D-132-CV-2021-00002.

22. At every phase of the appeal of the red tag, the Board of County Commissioners of the Incorporated County of Los Alamos and Arellano violated the due process rights of Plaintiffs.

23. The red tag issued by Arellano was unconstitutionally vague. EXHIBIT 1. It served to deprive Plaintiffs of all beneficial economic use of the leasehold premises, as it was applied holistically.

24. The proceedings outlined in EXHIBIT 1 involved several of the Defendants. In particular, Defendants Scott, Priestly, Shelton, Burgess, Leaphart, Ryti, and Andrus (the "Board

Defendants"). These Defendants, at various times, individually violated the due process rights of the Plaintiffs. *See* EXHIBIT 1 ¶¶ 53 – 63.

25. At the time the red tag was issued, Plaintiffs were unable to make any economically beneficial use of their leasehold premises.

26. The red tag prevented Plaintiffs from doing *anything* in their leasehold premises. They could not complete any necessary work to open the space as a restaurant—or any other business—nor could they do any work inside the leasehold premises, or even occupy it.

27. This was due to the Board of the County Commissioners of the Incorporated County of Los Alamos's claim that it has a "holistic" building code, requiring that all work contemplated must be performed all at once, such that Plaintiffs would be required to perform a total remodel rather than just the few improvements and repairs necessary to revitalize the leasehold property.

28. No "holistic" approach is mentioned in the building code adopted by the Board of the County Commissioners of the Incorporated County of Los Alamos or in the New Mexico Building Code.

29. The Board of the County Commissioners of the Incorporated County of Los Alamos's interpretation of the New Mexico Building Code as requiring a "holistic" approach imposed on Plaintiffs a "holistic" red tag—one that prevented any further work or use of the leasehold premises.

30. The Board of the County Commissioners of the Incorporated County of Los Alamos never compensated the Plaintiffs for the loss of their leasehold premises.

31. Leaphart served the dual role as attorney for the Board of Appeals and for Board of the County Commissioners of the Incorporated County of Los Alamos. Throughout the appeal proceedings, Leaphart advised the Board of Appeals and the Board of the County Commissioners

of the Incorporated County of Los Alamos. In doing so, Leaphart drafted the procedural and scheduling order ("PSO") for the appeal, and helped structure the proceeding. Leaphart advised the Board not to issue written findings. Leaphart crafted the proceedings in such a manner as to remove clearly established statutory and constitutional safeguards, and to ensure that Plaintiffs could not prevail by shifting to them the burden to prove that they had done nothing to warrant a red tag.

32. Scott served as both chairperson of the Board and as a member of the Los Alamos County Council. During the time she was a member of the Board, she was in active communication with developer NMIT to secure the sale and demolition of the Mari Mac. She bragged over local radio about her success in obtaining a deal (which ultimately fell through) for the sale and redevelopment of that property as "special good news."

33. Priestly served as the chairman of the Board of Appeals after the departure of Scott. He oversaw the proceedings through the substantive hearings, and was again chairman when the appeal proceedings were remanded to the Board of Appeals. As chairman, Priestly directed the proceedings, and is primarily responsible for the decisions of the Board of Appeals made during the course of the Plaintiffs' appeal, including the decisions made during the 2022 hearings.

34. Priestly conducted the hearings in a manner that violated Plaintiffs' due process rights. *See* Exhibit 1. Priestly, during the 2022 hearings, refused to allow Plaintiffs to participate, denying them due process again. The second set of hearings were closed to the public.

35. The second set of hearings were held pursuant to a remand order issued by the state court.

36. The members of the Board of Appeals during the 2022 hearings were Priestly, Ryti, and Shelton. Each member condoned Priestly's decision to close the meetings to the public after they

had convened, and no member objected to Priestly's opening remarks, which did not appear on the agenda for that meeting.

37. No member of the Board of Appeals objected to Priestly's refusal to allow the participation of Plaintiffs in the proceedings, despite that the proceedings were part of Plaintiffs' appeal.

38. The state court was sharply critical of the Board of Appeals, and in particular the acts of Priestly in conducting the appeal. Priestly either knew or should have known that his refusal to allow participation by Plaintiffs in their own appeal was violative of due process in light of the criticisms of the state court.

39. Likewise, each member of the Board of Appeals knew or should have known, based on the scalding critiques of the state court, that Priestly's refusal to allow Plaintiffs to participate in their own appeal was violative of due process.

40. Shelton and Ryti served as members of the Board of Appeals. Ryti also served on the Los Alamos County Council, and worked with Scott to secure the sale and demolition of the Mari Mac.

41. Burgess was, at all relevant times, manager of Board of the County Commissioners of the Incorporated County of Los Alamos. He received the complaint for appeal filed by Plaintiffs. Burgess received the complaint for appeal on November 22, 2019. He ignored that complaint for months, until finally, on February 21, 2020, the Board of Appeals was constituted.

42. Andrus is the Director of Community Development Department, a department of the Board of the County Commissioners of the Incorporated County of Los Alamos, was the supervisor of Arellano, and Andrus testified as part of the Plaintiffs' appeal before the Board.

43. Ricci is designated as the custodian of records under Section 14-2-7 NMSA 1978, and is responsible for ensuring the compliance of the County of Los Alamos with the Inspection of Public Records Act ("IPRA"). She is the correct entity to be sued for violations of IPRA. § 14-2-11(C)

NMSA 1978) "A custodian who does not deliver or mail a written explanation of denial within fifteen days after receipt of a written request for inspection is subject to an action to enforce the provisions of the Inspection of Public Records Act . . . ."

44. Plaintiffs have made sixty-three (63) IPRA, which are documented in detail in EXHIBIT 2.

45. Larry Valdez was at all relevant times an employee of Board of County Commissioners of the Incorporated County of Los Alamos. On August 6, 2020, Nucklos made a request under the New Mexico Inspection of Public Records Act. Valdez altered public records six days after they had been requested by Nucklos, misrepresenting a past material fact in the public record. He did so with the intent that any person reading the record would rely on the misrepresentation.

46. Valdez never disclosed this alteration, and the alteration was material.

47. As a result of Valdez's alteration of public records six days after they had been requested by Nucklos, Nucklos did not receive public records which are subject to inspection under the Inspection of Public Records Act.

48. Other responses to IPRA requests were deficient. Ricci and/or her agents produced incomplete responses, and also excessively redacted responses without any explanation for each redaction, and often responded to requests late—if she responded at all, as some requests went without any response.

49. The Board of the County Commissioners of the Incorporated County of Los Alamos, Arellano, Scott, Andrus, and Ryti, each treated other businesses differently than they treated Plaintiffs.

50. Boese Bros., which operates its business in Sirphey's former location, was allowed by Board of the County Commissioners of the Incorporated County of Los Alamos and Arellano to

expand and completely remodel its space, including the addition of a commercial kitchen without any construction permits (although one was ultimately issued after Plaintiffs protests to Andrus).

51. Andrus—who is not authorized by ordinance to remove a red tag—removed the red tag at the request of Smith's, after Smith's terminated the lease with Sirphey. All Smith's had to do was send Andrus a letter requesting the red tag be removed, and it was removed the very next day.

52. What Plaintiffs could not accomplish in months of a lengthy appeal process Smith's was allowed to accomplish with minimal effort in a single day.

53. Fleur de Lys was allowed to have a free-standing, unattached bar structure without requiring a permit or being red-tagged by Arellano and Board of the County Commissioners of the Incorporated County of Los Alamos.

54. Scott was noted by the state court as showing animosity toward Plaintiffs. (EXHIBIT 1).

55. Priority Properties is property management company utilized by Smith's for the operation of the Mari Mac. Priority Properties and Smith's employed Steve Waller, who operates a local plumbing business, to provide on-site operations at the Mari Mac, including repairs and lockouts.

56. Smith's was, at all relevant times, owner of the Mari Mac, and had reached an agreement brokered by Scott for the sale of the Mari Mac. It sought to terminate Plaintiffs' lease as a result of this agreement brokered by Scott. Smith's actively interfered with Plaintiffs' business relations by diminishing Plaintiffs' reputation and relationship with County officials; directing Priority Properties to change the locks on the space while Sirphey remained the lawful tenant, and consenting to Waller's breaking and entering and vandalism of the space.

57. Waller, without authorization from Plaintiffs, entered into the Plaintiffs' leasehold premises with intention to commit further felonious acts inside. Specifically, Waller intended to

disable security cameras, vandalize fixtures such as locks by putting superglue in them, and interfere with Plaintiffs' access to the leasehold premises.

58. By knowledge or belief, Waller acted on behalf of Priority and Smith's. Waller was aware of the sale of the Mari Mac, and that Plaintiffs' business would hinder redevelopment of the Mari Mac. By knowledge or belief, Waller was incented to prevent Plaintiffs from ever opening UnQuarked, as his principals, Priority and Smith's, stood to gain more money if the Mari Mac was sold for redevelopment than by leasing the space to Plaintiffs.

59. Waller was also incented to retaliate against Plaintiffs for their unwillingness to hire him to perform work in the leasehold premises.

60. Waller was in a position wherein he could, and did, intentionally interfere with Plaintiffs' contractual relations with Smith's by: 1) making false allegations against the Plaintiffs and repeating these false allegations during hearings before the Board—going so far as to offer to write a false affidavit to support the red tag; 2) vandalizing Plaintiffs' leasehold premises by damaging doors and locks—going so far as to put glue in the locks—and covering security cameras to evade detection.

61. As a result of the Defendants' acts, Plaintiffs incurred substantial damages in the form of attorneys' fees, lost profits, and costs incurred in preparing their leasehold premises for use as a business.

## IV. Claims

First Claim for Relief
Violations of Due Process
(US Const. Amend. XIV)
[The Board of the County Commissioners of the Incorporated County of Los Alamos, Leaphart individually, Arellano individually, Priestly individually, Ryti individually, Shelton individually, Scott individually, Burgess individually, Andrus individually]

62. Plaintiffs restate and reallege the allegations of Paragraphs 1-61 above as if fully set out herein.

63. The U.S. Constitution guarantees Plaintiffs the right to due process.

64. The individual Defendants and public body defendants acted under color of law at all relevant times.

65. The process thrust upon Plaintiffs by these Defendants was irregular, improper, biased, unfair, insufficient, and unconstitutional.

66. Arellano violated Plaintiffs' due process rights by issuing a vague red tag which lacked sufficient specificity to give notice required under due process, and also lacked any legal or factual support.

67. Burgess violated Plaintiffs' due process rights by failing to initiate the Board of the County Commissioners of the Incorporated County of Los Alamos's appellate process in a meaningful time, and that delay is not excused by any circumstance.

68. Scott violated Plaintiffs' due process rights by sitting as chair of the Board of Appeals while also dealing with Smith's and NMIT to secure the sale and demolition of the Mari Mac, which was a conflict of interest. This same conflict affected Ryti, who participated in those talks. Scott displayed obvious bias against and animosity toward Plaintiffs during her tenure as chair of the Board of Appeals.

69. Scott, along with Leaphart, violated Plaintiffs' due process rights through the creation and adoption of an improper Procedural and Scheduling Order which shifted the burden of proof during the appeal to the Plaintiffs, and away from Arellano, and which removed the Ordinances' requirement of written findings of fact after a hearing.

70. Leaphart drafted the PSO, and as an attorney, understood that by removing from the PSO certain statutory requirements, and understood that shifting the burden of proof away from Arellano and to Plaintiffs was violative of Plaintiffs due process rights.

71. Priestly, Ryti, and Shelton conducted the proceedings before them in a manner that violated Plaintiffs' due process rights. *See* EXHIBIT 1.

72. The same conflicts of interest which plagued Scott also tainted Ryti, who participated in talks with Smith's and NMIT for the sale and redevelopment of the Mari Mac.

73. Andrus participated in the proceedings and testified against the Plaintiffs to support Arellano's Stop Work Order, which was constitutionally and legally deficient.

74. The Board of Appeals—on the advice of Leaphart—failed to issue a written findings and decision as required by both county ordinances and due process.

75. This caused the County Council to review the Board of Appeal's decision without a written findings and decision to review. One member of the Council expressed confusion as to what he was meant to be doing as part of the review.

76. As a result of these violations, Plaintiffs spent months navigating an unfair appellate process which was designed by Leaphart and the Board of the County Commissioners of the Incorporated County of Los Alamos to prevent Plaintiffs from prevailing in their appeal, and that appellate process was enforced by biased members of the Board of Appeals.

77. This resulted in Plaintiffs being unable to ever re-open their business, and as a result they lost profits from their business. As a result of the Board of the County Commissioners of the Incorporated County of Los Alamos's and individual defendants' actions, Plaintiffs lost their leasehold premises entirely; were unable to recoup expenses already sunk into that leasehold premises; could not recapture the value of the improvements made to the leasehold premises; and

consequently lost any profits that would have resulted from the operation of their business for the duration of the lease.

78. Plaintiffs, in losing their lease, also lost the value of the improvements they made to the leasehold premises.

79. Plaintiffs, in appealing the Board's decision, incurred further losses in the form of attorneys' fees.

80. The conduct of the Defendants outlined in this claim was malicious, oppressive, and/or in reckless disregard of Plaintiffs' rights.

Second Claim for Relief
Open Meetings Act Violations
(Sections 10-15-1 NMSA 1978 et. seq.)
[The Board of the County Commissioners of the Incorporated County of Los Alamos]

81. Plaintiffs restate and reallege the allegations of Paragraphs 1-80 above as if fully set out herein.

82. The Board of Appeals and County Council are Administrative Adjudicatory Public Bodies subject to the New Mexico Open Meetings Act, §§ 10-15-1 et. seq.

83. Plaintiffs' appeal before the Board was subject to a series of hearings before the Board of Appeals between 2020 and 2022.

84. Pursuant to a remand order from the state court, the Board of Appeals reconvened in closed session on January 19, 21, 24 & 25, 2022 to produce written findings and to take final action within the authority of the Board of Appeals. *See* § 10-15-1(B) NMSA 1978.

85. This second set of hearings were held in closed session for the purpose of taking final action, contrary to New Mexico's Open Meetings Act. *See* §§ 10-15-1(A), (H)(1) and (3) NMSA 1978.

86. Administrative hearings once convened cannot subsequently be closed. *See* § 10-15-1(B) NMSA 1978.

87. Administrative hearings can only be conducted after reasonable notice to the public. § 10-15-1(D) NMSA 1978. That notice must state: 1) the specific law authorizing the closed meeting; 2) with reasonable specificity, the subjects to be discussed; and 3) an agenda containing a list of specific items of business to be discussed or transacted at the meeting or information on how the public can obtain a copy of such an agenda.

88. At any hearing, including closed hearings, an administrative body can only act on items appearing on the agenda. *See* § 10-15-1(E)-(F) NMSA 1978.

89. Any formal action taken by the Board of Appeals during the second series of hearings was void because: 1) the hearings were closed; 2) the published agenda was inaccurate citing a law which does not exist; 3) the published agenda for the January 19, 2022 hearing was incomplete, as it did not include the opening remarks by Priestly; 4) final Board of Appeals action on the Stop Work Order could not be taken in a closed hearing; 5) no written minutes were kept of the Board of Appeals' meetings nor are available for public inspection.

90. No action of any board is valid unless taken or at a meeting held in accordance with the requirements of the Open Meetings Act.

91. Individuals may privately enforce violations of the Open Meetings Act. § 10-15-3(B) NMSA 1978.

92. The Open Meetings Act holds that the Court shall award costs and reasonable attorney fees to any person who is successful in bringing a court action to enforce the provisions of the Open Meetings Act. *See* § 10-15-3(C) NMSA 1978.

93. Plaintiffs have provided the Board and its Members written notice of the violations and more than 15 days has passed without appropriate, curative Board action.

94. Plaintiffs are entitled to recover attorney's fees and costs.

### Third Claim for Relief
### Violations of New Mexico Inspection of Public Records Act
### (§ 14-2-1 NMSA 1978 et. seq.)
### [Ricci, Board of the County Commissioners of the Incorporated County of Los Alamos]

95. Plaintiffs restate and reallege the allegations of Paragraphs 1-94 above as if fully set out herein.

96. During all relevant times, Plaintiffs have made a number of IPRA requests to County Officials which have gone unanswered, been untimely, or which have been partially, inaccurately, or untruthfully answered, or have been sent with such extensive redactions that those documents could not be identified at all. The redactions were made without any specificity, and the only explanations for the redactions were boilerplate explanations added to one page of the County's response that were not specific to any particular redaction.

97. By way of example, Plaintiffs made an IPRA request on August 6, 2020 for all records and communications regarding the façade of the Mari Mac.

98. Altered records were provided to Nucklos on August 18, 2020. Screenshots provided by RIM made it evident that other records provided to Nucklos had been altered on, or about, August 12, 2020, six days after the IPRA request was made.

99. The alterations were apparently made by Valdez, as the edited file was initialed by him.

100. Valdez misrepresented a past material fact in public record.

101. Valdez made his alteration with the intent that any person reading the record rely on the misrepresentation.

102. No notice of the alteration was provided before the disclosure.

103. Plaintiffs relied on the altered records without initially being aware they were altered. That reliance is justified, as ordinarily neither a public entity nor its officials would alter records.

104. The status of the Mari Mac's façade was material information to the Plaintiffs to whom Smith's had represented it would be upgrading the façade in which its leasehold premises was located.

105. Alteration of the record prior to its disclosure was a violation of IPRA.

106. Dealing with the foregoing alteration caused Nucklos to expend time, and Plaintiffs to investigate and force the release of the true original records. This caused Nucklos and the Plaintiffs damages by way of her time and their payment of attorney's fees.

107. Plaintiffs are entitled to statutory damages under IPRA.

Fourth Claim for Relief
Unconstitutional Taking
(US. Const. Amend V, XIV)
[Board of the County Commissioners of the Incorporated County of Los Alamos and Arellano, individually]

108. Plaintiffs restate and reallege the allegations of Paragraphs 1-107 above as if fully set out herein.

109. Defendants' conduct constitutes a taking under the Fifth Amendment, for which Plaintiffs have not been compensated for.

110. A per se regulatory taking occurs when government regulation completely deprives an owner of all economical beneficial use of the property. *See City of Las Vegas v. 180 Land Co.,*

*LLC,* 140 Nev. Adv. Op. No. 29 (April 18, 2024) (citing *McCarran Int'l Airport v. Sisolak*, 137 P.3d 1110, at 1122, 122 Nev. 645 at 662 (2006)).

111. The question of whether a landowner has been deprived of all economically viable use of a property is a question for the finder of fact. *City of Monterey v. Del Monte Dunes*, 526 U.S. 687 at 690 (1999).

112. In this case, the Defendants, by placing a vague and constitutionally violative Red Tag on Plaintiffs' leasehold premises, deprived the Plaintiffs of all economically beneficial use of their property.

113. During the appellate proceedings, the Board of the County Commissioners of the Incorporated County of Los Alamos argued that it has a "holistic" building code, requiring that all work contemplated must be performed all at once, such that Plaintiffs would be required to perform a total remodel rather than just the few improvements and repairs necessary to revitalize the leasehold property.

114. There is no "holistic" building code in the County of Los Alamos, and the New Mexico Building Code imposes no such requirement either. As the state court pointed out, the outcome of a failed building permit application should be that no building permit is issued, not that a Red Tag is issued. EXHIBIT 1, ¶ 96.

115. The Board of the County Commissioners of the Incorporated County of Los Alamos's interpretation of the New Mexico Building Code as requiring a "holistic" approach imposed on Plaintiffs as a "holistic" Red Tag, one that prevented any further work or use of the leasehold premises. There is no statutory or regulatory basis for the "holistic" Red Tag.

116. The Red Tag was issued out of animosity by Arellano, and was repeatedly sustained and protected by the Board of the County Commissioners of the Incorporated County of Los

Alamos—not due to any regulatory or statutory reason—but because of the preference by the Board of the County Commissioners of the Incorporated County of Los Alamos toward the redevelopment of the Mari Mac rather than toward fostering economic growth therein.

117. The Red Tag's holistic nature left no viable alternative for Plaintiffs to reap economic benefit from their leasehold premises. Plaintiffs entered into a lease explicitly for a commercial kitchen.

118. The Lease had provisions requiring the Plaintiffs to open a restaurant by a certain date. *Id.*

119. There was no economically viable use of the leasehold premises but to operate it as a restaurant, as the terms of Plaintiffs' lease required them to open their restaurant. No other use was contemplated or economically viable.

120. The Red Tag prevented Plaintiffs from doing *anything* in their leasehold premises. They could not complete necessary work to open the space as a restaurant—or any other business—nor could they do any work inside the leasehold premises, or even occupy it.

121. The placement of the Red Tag was a taking.

122. No compensation was ever made to Plaintiffs for their leasehold premises.

123. Because no compensation was ever made to Plaintiffs, the Defendants have violated Plaintiffs rights under the Fifth and Fourteenth Amendments by way of a regulatory per se taking.

124. The Defendants acted in a manner that was malicious, oppressive, and/or in reckless disregard of Plaintiffs' rights.

125. By the foregoing actions, these Defendants caused the Plaintiffs damages.

Fifth Claim for Relief
Equal Protection
(US Const. Amend., XIV)
[The Board of the County Commissioners of the Incorporated County of Los Alamos, Arellano, individually]

126. Plaintiffs restate and reallege the allegations of Paragraphs 1-125 above as if fully set out herein.

127. At all relevant times, the Defendants in this claim were acting under color of law.

128. Plaintiffs were treated differently, unequally, and disparately than at least three other similarly situated parties.

129. One such similarly situated party is Boese Bros., which operates its business in Sirphey's former location, and was allowed by the Board of the County Commissioners of the Incorporated County of Los Alamos and Arellano to expand and completely remodel its space (including the addition of a commercial kitchen) without a permit (although one was ultimately issued after Plaintiffs protests to Andrus).

130. Smith's was treated differently. Andrus—who is not authorized by ordinance to remove a Red Tag—removed the Red Tag at Smith's request, and did so the day after Smith's made the request.

131. Fleur de Lys was allowed to have a free-standing, unattached bar structure without requiring a permit or being Red Tagged by Arellano and CLA.

132. By contrast, Plaintiffs were made to endure a lengthy, unfair, expensive, and unconstitutional appeals process in their attempts to remove the Red Tag. EXHIBIT 1.

133. This disparate treatment of similarly situated parties by government officials and government bodies violates Plaintiffs' equal protection rights under the US Constitution.

134. This disparate treatment has caused the Plaintiffs damage.

135. Plaintiffs are entitled to compensatory damages, lost revenue, attorneys' fees, and interest.

Sixth Claim for Relief
Interference with Contractual Relations
(Common Law Theory)
[Waller, Priority]

136. Plaintiffs restate and reallege the allegations of Paragraphs 1-135 above as if fully set out herein.

137. Waller actively interfered with Plaintiffs' contractual obligations with Smith's by 1) making false allegations of theft against Plaintiffs; 2) vandalizing the leasehold premises; 3) publicly supporting the false narrative that the Red Tag issued by Arellano was valid; 4) delaying Plaintiffs' fulfillment of the open-by clause in their Lease; 5) twice locking Plaintiffs out of the leasehold premises while Plaintiffs had legal possession; and 6) releasing information in Plaintiffs' lease to Los Alamos County officials without Plaintiffs' authorization.

138. While none of Waller's allegations were true, they diminished Sirphey's reputation and relationship with Smith's, County Officials, and others.

139. By knowledge and belief, Waller as agent or employees of Priority, disclosed a copy of the Lease between Plaintiffs and Smith's to Arellano at his request.

140. Waller and his principals by respondeat superior are the direct and proximate cause of damage to Plaintiffs.

141. Waller was acting under apparent or implied authority of his principals.

142. The conduct and false allegations of Waller caused Plaintiffs damage.

143. Waller sought to accomplish wrongful objectives using improper means.

144. Smith's had a right to control, and is vicariously responsible for, the conduct of its agent Priority.

145. Priority had a right to control, and is vicariously responsible and liable for the conduct of its agent, Waller.

146. By virtue of their relationship, each principal is vicariously and severally liable for the conduct of its agent.

147. Waller caused damage to the Plaintiffs for which Priority and Smith's are vicariously and severally liable.

Seventh Claim for Relief
Trespass
(Common Law Theory)
[Waller, Priority, Smith's]

148. Plaintiffs restate and reallege the allegations of Paragraphs 1-147 above as if fully set out herein.

149. At all times relevant, Sirphey lawfully held the Lease and was entitled to quiet enjoyment of the leasehold premises.

150. Waller, either individually or as an agent of Priority and/or Smith's, intentionally broke into the leasehold premises without authorization or privilege of entry under the Lease.

151. Waller trespassed into the leasehold premises.

152. Waller's unlawful break-ins occurred at night, during which entry into the leasehold premises by any person—in particular an agent of a landlord—would be highly unusual.

153. Waller's conduct demonstrates his *mens rea* in that he each time he broke into the premises he took deliberate precautions to avoid detection.

154. Waller's intention and purpose was to vandalize and trespass upon and within the leasehold premises.

155. Waller caused damage to the leasehold premises, including inserting glue into the door locks, breaking door frames, scratching doors, leaving doors hanging on single hinges, and leave the premises unsecure against subsequent potential and realized vandalism.

156. Waller acted in a willful, wanton and malicious manner.

157. Waller is the direct and proximate cause of damage to Plaintiffs.

158. Waller is an agent of Priority and of Smith's.

159. Priority and Smith's are vicarious liable for the actions of Waller under the doctrine of respondeat superior.

160. Smith's and Priority are liable for damage caused by Waller's trespass.

Eighth Claim for Relief
Civil Invasion of Privacy by Intrusion
(Common Law Theory)
[Waller, Priority, Smith's]

161. Plaintiffs restate and reallege the allegations of Paragraphs 1-160 above as if fully set out herein.

162. At all times relevant, Sirphey lawfully held the Lease and was entitled to quiet enjoyment of the leasehold premises.

163. Waller, individually and as an agent of Smith's and Priority, intentionally invaded the Plaintiffs' privacy by breaking into the leasehold premises without right, exception or privilege of entry under the Lease and during odd times and while covering security cameras to avoid detection.

164. Waller's invasion would be very offensive to any reasonable person, and it was very offensive to Plaintiffs.

165. Waller acted in a willful and wanton manner.

166. Waller's invasion caused Plaintiffs damage, loss, and wasted time.

167. Priority and Smith's are vicarious liable for the actions of Waller under the doctrine of respondeat superior.

168. Smith's and Priority are liable for damage caused by Waller's trespass.

Ninth Claim for Relief
Breach of Contract
(Common Law Theory)
[Smith's, Waller, Priority]

169. Plaintiffs restate and reallege the allegations of Paragraphs 1-168 above as if fully set out herein.

170. Smith's entered into a lease with Sirphey.

171. Sirphey entered into the lease in part based on representations of Smith's that the façade of the Mari Mac would be refurbished.

172. Smith's never refurbished the façade of the Mari Mac.

173. Through its agents, Priority and Waller, Smith's also breached its lease with Plaintiffs by:

a. Denying Sirphey quiet enjoyment of its leasehold premises;
b. Breaking into the Plaintiffs' leasehold premises;
c. Trespassing into the leasehold premises outside of normal hours without permission, valid reason, or access pursuant to the Lease;
d. Vandalizing the leasehold premises.

174. Smith's conduct has caused Sirphey damage.

Tenth Claim for Relief
*Deprivation of Federal Civil Rights*
42 U.S.C. § 1983 et. seq

[Scott, individually, Ryti, individually, Priestley individually, Arellano individually, The Board of the County Commissioners of the Incorporated County of Los Alamos].

175. Plaintiffs restate and reallege the allegations of Paragraphs 1-174 above as if fully set out herein.

176. Plaintiffs incorporate the foregoing allegations as if they were fully stated herein.

177. Plaintiffs claim deprivation of their rights, privileges and immunities secured by the US Constitution identified as follows:

a. rights secured under the Takings Clause of the Fifth Amendment; and

b. Due process;

178. At all times relevant, the Defendants identified in this claim were acting as 'public bodies' and/or 'persons' as described in 42 U.S.C. § 1983.

179. At all times relevant, the Defendants and public bodies identified in this claim were acting under 'color of law'.

180. At all times relevant, one or more of the Defendants identified in this claim subjected, or caused to be subjected, Jain to deprivation of his rights, privileges, and/or immunities secured by the Constitutions and laws of the United States and New Mexico identified in the foregoing narrative.

181. Defendants acted in a willful and wanton manner.

182. The Defendants identified herein have caused the Plaintiffs damage and costs which are on-going.

Eleventh Claim for Damages
*Exemplary Damage*
(Common Law Theory)

183. Plaintiffs restate and reallege the allegations of Paragraphs 1-182 above as if fully set out herein

184. One or more of the Defendant's conduct was willful, malicious, wanton, oppressive, or in reckless disregard of the Plaintiffs' rights.

185. The Defendants' conduct should be punished to deter the Defendants and others from committing similar misconduct in the future.

## VI. PRAYER FOR DAMAGES

The Plaintiffs pray for damages to include:

a) actual and future economic damages, including losses.

b) present and future non-economic losses and damages - mental anguish, fear, anxiety; humiliation, embarrassment, indignity and loss to the Plaintiff's reputation;

c) loss of present and future income;

d) damage to business;

e) punitive damages where allowed by law against certain Defendants;

f) statutory or reasonable interest [on-going];

g) court costs and damages allowed or specified by any state or federal statute including: NMSA §§10-15-3(C) and 10-15-4;

h) all expenditures related to the Project including, but not limited to, Lease payments, permit fees, inspection fees and any other similar governmental fees or charges [to be determined];

i) consequential damages;

j) incidental damages;

k) indirect damages;

l) general damages;

m) lost revenue [to be determined];

n) nominal damages (in the event certain damages are otherwise unquantifiable);

o) compensatory damages;

p) non-economic damages including reputational and other similar damages;

q) writ of mandamus or order of injunction or other appropriate remedy to enforce the provisions of the IPRA. NMSA § 14-2-12 et. seq.;

r) damages and amounts specified by the various statutes cited herein;

s) a declaration that any formal action taken by the Board during the *second* series of hearings illegal and invalid;

t) injunctive relief precluding enforcement of any alleged 'official action' taken by the Board during the *second* series of hearings;

u) lost future earnings;

v) court costs and reasonable attorney's fees including a reasonable amount for time lost in preparing for, attending and presenting this case;

w) attorney's fees & costs where provided by any statute cited herein and also pursuant to the *Civil Rights Attorney's Fees Awards Act*;

x) attorney's fees & costs *pendente lite* pursuant to 42 U.S.C. § 1988(b).

## VII. JURY REQUEST

Plaintiffs request that this matter be heard before a jury of six.

dd: 10/25/24

**Law Offices of Philip J. Dabney**

s/: *Philip Dabney*
Philip Dabney
Paul F. Geisik, Esq.
1505 15th St., Suite C
Los Alamos, NM 87544
(p) 505.662.3911
phil@dabneylawpc.com
paul@dabneylawpc.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 25th day of October, a true and correct copy of the foregoing Amended Complaint was sent to the attorneys for all parties of record by way of email.

*/s/ Paul F. Geisik*
Paul F. Geisik, Esq.

EXHIBIT
1

FILED 1st JUDICIAL DISTRICT COURT
Los Alamos County
3/12/2024 11:19 AM
KATHLEEN VIGIL CLERK OF THE COURT
Amy T Ruiz

STATE OF NEW MEXICO
LOS ALAMOS COUNTY
FIRST JUDICIAL DISTRICT COURT

SIRPHEY LLC,

Plaintiff (Appellant),

v. No. D-132-CV-2021-00002

BOARD OF THE COUNTY COUNCIL
OF LOS ALAMOS COUNTY, and MICHAEL
ARRELLANO, building official of Los
Alamos County,

Defendants (Appellees).

## FINAL DECISION ON PLAINTIFF APPELLANT'S APPEAL

THIS MATTER came before the Court on the Rule 1-075 NMRA appeal of Plaintiff Appellant, Sirphey LLC. The Court heard oral arguments on May 3, 2023 and on June 1, 2023. The Court announced its ruling on October 24, 2023 and on November 1, 2023. The Plaintiff Appellant was represented by Philip J. Dabney, Esq., and Defendant Appellees, the Board of the County Council of Los Alamos County and Michael Arellano, were represented by Randy Bartell. This Decision memorializes the Court's oral pronouncement made on October 24, 2023, at 1:00 p.m., and on November 1, 2023, at 3:00 p.m.

The Court, being fully advised in the premises, hereby makes the following Decision:

## PROCEDURAL HISTORY

1. This matter originally came before the Court in January 2021, on Appellant's Notice of Appeal.

2. Appellant sought to appeal the decision of the Board of Appeals and Los Alamos County Council to uphold the decision of the Chief Building Official ("CBO"), Michael Arellano, to place a Stop Work Order on Appellant's leasehold at 813 Central Avenue, in Los Alamos, NM.

3. Appellant's Notice of Appeal came with no written findings from either the Board of Appeals or the Board of the County Council.

4. The Defendant Appellees moved to dismiss the Appeal on several grounds. Each of Defendant Appellees' motions to dismiss were denied. In ruling on the Defendant Appellees' motions, the Court found that the Defendant Appellees had violated the Appellant's constitutional rights by failing to issue any written findings and decision.

5. In December 2021, this matter was remanded to the Board of the County Council to be remanded to the Board of Appeals for the issuance of a written decision.

6. A written findings and decision was issued by the Board of Appeals on January 25, 2023, and the Appellant appealed that written decision to the Board of the County Council.

7. The Board of the County Council was unable to reach a majority vote on Appellant's appeal as would be required under the Los Alamos County Charter, and therefore the decision of the Board of Appeals was upheld by the Board of the County Council by default.

8. In April 2022, the Appellant filed its Amended Application of Writ of Certiorari to this Court to appeal the Board of Appeals' written decision. The instant Court decision relates to the appeal of the written decision, including the manner in which the proceedings below were conducted and the basis of the Board of Appeals' decision.

9. On May 3, 2023, and on June 1, 2023, the parties to this appeal made oral arguments before this Court on Appellant's appeal of the written decision.

10. On October 24, 2023, and then on November 1, 2023, the Court pronounced its oral findings and decision.

## Decision

### I. The Proceedings Below Were Not Conducted in Accordance with the Law, and violated the due process rights of Plaintiff Appellant at every phase of the proceedings

#### A. The Stop Work Order issued by the Chief Building Official lacks the required specificity to give notice to Plaintiff Appellant

11. The Stop Work Order issued by the Chief Building Official was general and vague, and is not specific enough to provide the notice required by due process to the Appellant as to the reasons for the Stop Work Order.

12. A stop work order can be issued for specific reasons provided for in both the Los Alamos County Ordinances at Section 10-80, and in the regulations adopted by the Construction Industry Division ("CID") at 14.5.3.10 NMAC.

13. An inspector or other Authority Having Jurisdiction ("AHJ") may order work be stopped and shall give written notice of such work to the person performing the work and the owner of the property. *Id.* If the inspector discovers a life safety issue contrary to the CID's rules, the inspector may issue a stop work order and give written notice of the order to the appropriate parties.

14. The regulations outline the conditions for which a stop work order may be issued. These include: a) inspection determined the existence of a health or safety hazard; b) continuing work without full correction of previously noticed violations; c) work deviating from approved plans or materials; d) contractor not properly licensed; e) contractor working beyond the scope of licensure; f) work not properly permitted, and; g) improper journeymen ratios."

15. Section 10-81 of the Los Alamos County Code of Ordinances ("LACCO") governs the official discretion granted by the County of Los Alamos to the CBO.

16. Section 10-81 limits that discretion to only making the determination whether the rules and standards established by the ordinances have been complied with, and that Section 10-81 does not give such building officials any discretionary powers as to what such regulations or standards shall be or power to require conditions not prescribed by the ordinances, or to enforce article provisions in an arbitrary or discriminatory manner.

17. The Stop Work Order in this matter states it was issued for "No permit for work – building, plumbing, electrical, mechanical and fire."

18. The Chief Building Official has an obligation to investigate. § 14.5.1.8 NMAC.

19. Notice is important to due process because the right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest. *See NM Department of Workforce Solutions v. Garduno*, 2016-NMSC-007, ¶ 24.

20. Basic due process considerations about fair notice require a stop work order be reasonably specific and concrete so as to fairly apprise the recipient of the stop work order of the specific violation. *See Noblesville v. FMG Indianapolis, LLC*, 201 N.E.3d 1175 at ¶ 14 (Ind. App. 2022).

21. New Mexico's codes and ordinances support the requirement of specificity for a stop work order, and the requirement that a Chief Building Official is obligated to conduct an investigation to determine if there is sufficient evidence to establish whether a violation exists, and is obligated to conform his or her acts of discretion within the provisions of Section 10-81 LACCO. The CBO, throughout the underlying appeal, held the position that stop work orders are simply placed to cause an individual to make contact with him. This is not what stop work orders are meant to do.

Moreover, as discussed below, The CBO refused to communicate with the Appellant, even after Appellant sent an appeal letter on the same day as the Stop Work Order where Appellant requested contact, and the CBO provided no explanation for that refusal. Thus, the CBO's assertion that a stop work order is merely to communicate is not even substantiated by his conduct.

22. The Stop Work Order was issued in a generic sense. *See* Court's Oral Pronouncement, October 24, 2023, at 14:25 – 49:56.

23. No inspection of the premises was ever performed by the CBO prior to the placement of the Stop Work Order, in violation of his duty to perform such inspections. *Id.* The CBO testified that he drafted his Stop Work Order in his office on November 12, claiming it is too difficult to write on the hood of his truck to make his Stop Work Order legible. *Id.*

24. The Stop Work Order was therefore drafted prior to any inspection of the premises, and the CBO conceded he had failed to uphold his duty to investigate. *Id, also see* Record, Volume 4, July 13, 2020 Proceedings, P.58:4 – 60:8.

25. The Board of Appeals Chairman Terry Priestly prevented cross-examination into the specific reason why the Stop Work Order was issued and prohibited the Appellant from proceeding with any line of questioning relating to the specific reason why the Stop Work Order was issued.

26. Based on the above, the Court concludes that the Stop Work Order as issued, violated the due process rights of Appellant, and did not provide the specific reasons for its issuance so that the Appellant could determine whether or not he wanted to contest what he was encountering with the Stop Work Order or adjust and comply with what needed to be done in order to have it removed.

27. As a result of this generic Stop Work Order, an appeal was necessary to address this generic or "general statement" as the Board Chairman characterized it.

28. Thus, the Stop Work Order was deficient. It was placed by the CBO who admittedly performed no investigation, and performed no inspection, and thus violated Appellant's due process rights. The Stop Work Order was also generic, and did not state with specificity the reasons for its issuance, so that Appellant could determine whether or not he wanted to contest the Stop Work Order, or correct any specific violations if there were any. This generic Stop Work Order violated the Appellant's due process rights by failing to provide adequate notice.

29. As a result of this violation, an appeal was necessary to address this generic statement, and that appeal resulted in protracted litigation which has taken years to determine the specific reasons why the Stop Work Order was issued.

**B. The proceedings below were not conducted within a reasonable and meaningful time or in a meaningful manner.**

30. Due process requires that there be the opportunity to be heard in a meaningful time and in a meaningful manner. *See Cerrillos Gravel Prods. V. Board of Cnty. Comm'rs*, 2005-NMSC-023, ¶ 28, 138 N.M. 126.

31. The proceedings below were not conducted in a meaningful time. The Appeal was submitted on November 22, 2019. No substantive hearing was initiated until February 21, 2020, a delay of 91 days.

32. The Appellees claim two reasons for the delay: 1) failure of Sirphey, LLC to use a county-approved form for requesting the appeal and 2) the COVID-19 pandemic in March 2020. Neither reason provides a persuasive basis for the unreasonable delay in the appeal process.

33. The failure by Appellant to use a specific form does not excuse the delay. The Los Alamos County Code of Ordinances governs the right of appeal. Nowhere in these ordinances is a requirement that, in order to effectuate an appeal, an individual must use a prescribed form. *See* Oral Pronouncement, October 24, 2023, 55:00 – 57:15.

34. Where the ordinances require the use of specific forms, those forms are specified. *Id.*

35. There is no language requiring the use of a specific form to request an appeal under Section 10-84 LACCO. All that is required is that a written complaint be made to the county manager. *See* Court Pronouncement, 1:03:00 – 1:11:10. This was done by the Appellant on the same day the Stop Work Order was issued.

36. Other forms required by the County do not meet the requirements of the Ordinances. *See* Oral Pronouncement, October 24, 2023, 57:16 – 1:02:55. During the proceedings below, there was much effort made to attempt to establish the Appellant falsified a document and fraudulently claimed it was the owner of 813 Central Avenue, and that only the owner of 813 Central Avenue could submit an affidavit under Section 10-73 of the Los Alamos County Code of Ordinances. *Id.*

37. However, it is clear the county's interpretation of Section 10-73 was erroneous, and the county's forms, which do not meet the requirements of Section 10-73, created this confusion. Section 10-73 does allow parties other than the owner of a property, and in this matter would obviously allow Appellant, to file an affidavit under that Section, provided that person comply with two requirements—that the proposed work is authorized by the owner in fee and that the person making the application is authorized to make the application. *Id.* The form provided by the CBO only has a form for the owner's affidavit, and thus does not comport with Section 10-73(b)(2) of the Los Alamos County Code of Ordinances. *Id.*

38. In light of the inaccuracies of the owner's affidavit form, it is concerning that there be demands that other forms be used as well, and that the Appeal form is only available—if it is available at all—at the office of the CBO.

39. The CBO's claim that he interpreted the Appellant's demand for appeal as an Inspection of Public Records Act ("IPRA") request is not persuasive. *See* Oral Pronouncement, October 24, 2023, at 1:04:00 – 1:11:05.

40. Appellant's demand for appeal was clearly not an IPRA Request, and the County did not treat it as one. *Id.* It clearly was a complaint and met all the requirements of a request for appeal under Section 10-84 of the Los Alamos County Code of Ordinances.

41. The Appellees' delay is therefore not justified by the Appellant not using the County's approved appeal form.

42. The Appellees also assert that the COVID-19 pandemic caused the delays. This does not justify the delay. *See* Oral Pronouncement, October 24, 2023, at 1:17:30 – 1:21:35.

43. This Court also experienced the pandemic, and by the end of March 2020, was conducting remote virtual hearings, as were all divisions of the First Judicial Court, and all District Courts in New Mexico. *Id.*

44. In fact, by August 2020, in-person trials were being conducted by the District Courts. *Id.*

45. The hearing on Appellant's appeal, took until June 11, 2020, to be heard by video conferencing. In light of that the appeal was heard by video conferencing on June 11, 2020, there is no reason the hearing could not have been held when it was originally scheduled in March 2020. *Id.*

46. The delay between when the appeal was first requested and when it was held was 202 days, or six and a half months.

47. In light of the interests at stake, there is no reason for an appeal under Section 10-84 to take more than 45 days, and it should be even less than 45 days. Had the appeal been heard within a

reasonable time after the appeal was initiated, it could have been completed even before the pandemic arose.

48. Other jurisdictions, such as New Jersey, recognize the importance of swift actions when these interests are at stake. As procrastinating and delaying such appeals will cause significant financial burdens on those who are subject to the stop work order and will cause a great loss to those who carry leasehold agreements, such as the Appellant, it is important that such appeals be heard quickly. *See Clemmons v. Blue Chip Insurance Services Inc.*, 904 A.2d 825 (holding that an appellate agency must take action on a requested appeal no more than 10 business days following the submission of the appeal).

49. There is no reason for a 202-day delay to have occurred in this case, and neither of the Appellees' two justifications for it – the use of a form and COVID-19 – provide any justification for that delay.

50. Therefore, the Appellant's appeal was not heard in a meaningful time. It was also not held in a meaningful manner.

51. The issues that present themselves with regard to whether the appeal was held in a meaningful manner begin at the adoption of the *Procedural and Scheduling Order* ("PSO") in this case, which occurred at the hearing on February 21, 2020.

52. Ordinarily, a PSO is adopted by an administrative board to create a schedule for hearing proceedings before that board. A PSO is meant to safeguard the rights of the appealing party by creating deadlines and ensure that a hearing on the appeal is held in a timely manner. A PSO ordinarily creates deadlines for the making of written motions to ensure that there can be no unfair surprise or delay. A PSO ordinarily is created with the input of both parties. A PSO is not meant to nor is it able to create procedural requirements that do not exist at law, nor is it able to remove

procedural safeguards that exist at law. In this case, the Defendant Appellee used the PSO to violate the due process rights of the Appellant by adding a burden of proof not existing in the ordinances or the Building Code and by removing the requirement of written findings.

53. The transcript of this hearing is full of inaccuracies and is insufficient in itself to understand the bias and animosity that was exhibited against Sirphey LLC and its representatives by the Appellees at this hearing, and only by listening and watching the video to see what occurred can one see the bias exhibited. Oral Pronouncement, October 24, 2023, 1:23:07 – 1:35:35. The same holds true for the entire Appeal hearing.

54. The transcript of the hearing is contained on the record of appeal, at volume one from page 00088, all the way until page 000121.

55. Appellant was deprived of any meaningful participation in creating the PSO. Any time Appellant's representatives attempted to request an opportunity to be heard or to provide input regarding the PSO, they were stopped immediately by Sara Scott, who was the Chair of the Board of Appeals at that time. It is evident that there is animosity by the Board Chair toward the Appellant.

56. The animosity is apparent when viewing what happened in the interactions between Scott and Appellant's representatives versus the interactions between Scott and the government attorneys. The treatment is diametrically different. *See* Transcript of February 21, 2023 Hearing, at 4:19 – 6:3.

57. Scott immediately stopped any raising of an issue by the Appellant by way of making a motion and says only "overruled. It will be entered into the record, your motions." *Id.* This is a stark contrast to the way in which the government attorney was treated. Scott responds to the

government attorney's request to be heard with "please" and opens the floor to the attorney to be heard. *Id.*

58. As that attorney begins to recite that there are motions they would like to have heard, counsel for the government rises and begins to distribute to Appellant and the members of the Board copies of the motion to be heard, which appear to have been brought to Appellant's attention for the very first time.

59. Despite Appellant moving to make a motion and being told that its Motion is overruled, and the Motion will be entered into the record, Scott never put Appellant's Motion into the record. In fact, Scott made a request for advice from counsel, and then there was discussion and receipt of the Appellee's motions. *Id* at p. 7, p. 11:6 – 12:15.

60. Then further discussion by the government attorney proceeds regarding the motion. Scott accepts the Appellees' motion into the record without ever addressing Appellant's representative, Prashant Jain. *Id* at p. 7 – p.15:9. When Mr. Jain and Cortni Nucklos said "excuse us" and asked when Appellant was given the ability to comment on the procedure, Scott states: "Ok. The procedure is the same appeals procedure used for other matters in the county."

61. Mr. Jain was never allowed to provide any input as to the adoption of the terms contained in the PSO, which, when looking at the PSO itself, contains a number of provisions that violate Sirphey's due process rights. *See* Oral Pronouncement, October 24, 2023.

62. The PSO places the burden on the Appellant to prove the invalidity and unlawfulness of the CBO's Stop Work Order. *Id.* It creates a presumption in favor of the actions of the CBO, although the County's ordinances provide nowhere that the Appellant bears the burden and that the CBO's actions shall be presumed lawful. *Id.*

63. Although those specific elements do not appear anywhere in the County's ordinances, they were written into the PSO. Where there is a specific element in the ordinances requiring written findings, it is excluded from the PSO. *Id.*

64. The Appellees rely on two cases for the proposition that the burden is properly placed on Appellant. Neither are persuasive. The Board of Appeals, in its Order, relies on *Rio Grande Chapter of Sierra Club v. New Mexico Mining Commission*, 2003-NMSC-005. The Appellees, in their Brief, rely on *Gallup Westside Development LLC v. city of Gallup, 2004-NMCA-010.* Both cases deal with a completely different procedural posture than the one before the Board of Appeals. Both these cases deal with the burden of the Appellant before a district court reviewing an administrative agency's decision. Oral Pronouncement, October 24, 2023, 1:35:36 – 1:50:50. These cases do not deal with the burden of proof on a citizen when appealing a Stop Work Order before a Board of Appeals. *Id.* Therefore, these citations provide no support for Appellees' argument.

65. The case *City of New Haven v. Chemical Waste Management*, 701 N.E.2d 912 (Ind. Ct. App. 1998), addressed issues which are similar to the issues at bar. In that matter, the Indiana Court of Appeals held that it was improper to require an appellant to first bear the burden of proving that it is not in violation of a zoning ordinance.

66. The Court agrees, and *City of New Haven* resonates here. Section 10-31 of the Los Alamos County Ordinances, which outlines the powers and duties of the CBO, states in full:

> The office of the Building Official for the county is created, The Building Official has the power and duty to enforce the provisions of Article 3 of this Chapter and shall issue all permits provided by those provisions. In case any building or structure is constructed, reconstructed, altered, repaired, converted, or maintained, or any building or land is used in violation of this chapter, the County or the Building Official, in addition to prosecuting the violator in accordance with this Chapter, shall have the authority to institute appropriate actions or proceedings at law or in equity, to prevent and restrain such unlawful construction, reconstruction,

> alteration, repair, conversion, maintenance, and use, and to restrain, correct, or evade such violation, and to prevent the occupancy or use of such building or structure.

Section 10-31 Los Alamos County Code of Ordinances.

67. A Stop Work Order is an injunction. It prevents further activity at the premises at issue, and as Section 10-31 states, the CBO is the party prosecuting the violator. As the prosecuting party, the CBO bears the burden to establish why an injunction summarily imposed upon the citizen is justified.

68. This is especially true in light of the fact that the Stop Work Order in this case violated due process by not providing any specificity as to the reasons for its issuance, but merely provided a general statement which left – as Chairman Priestly said – Appellant without knowing why the Stop Work Order was issued against it.

69. This problem becomes exacerbated when the burden is placed on the citizen to prove the invalidity of the Stop Work Order, and requiring the citizen to proceed first in presenting their evidence. When a Building Official does not have to provide its justifications until after the citizen's attempts to establish that the Building Official's actions were unlawful in placing a general, non-specific Stop Work Order, the Building Official then has the ability to listen to the citizen's testimony and craft reasons for its Stop Work Order that were not considered at the time of its issuance, but were generated after the fact. ***See*** Oral Pronouncement, October 24, 2023, 1:35:36 – 1:50:50.

70. This further allows for the party examining the citizen to engage in a fishing expedition and explore through cross-examination the actions of the citizen and see if the citizen will admit to violations that were not stated in the Stop Work Order and not contemplated by the Building Official which would then, after the fact, justify its issuance. ***Id.***

71. There are many examples in the underlying appeal of the problems that occur when the burden of proof is placed on the citizen when no Stop Work Order providing specificity exists, and allowing for cross examination to find violations that were not known or considered at the time of the Stop Work Order. *See* Oral Pronouncement, October 24, 2023.

72. Throughout the proceedings, the counsel for the CBO engaged in cross-examination which was entirely exploratory. *Id.* None of the information which the CBO sought was known to the CBO prior to the hearing on Appellant's appeal. *Id.* The cross-examination was solely for the purpose of finding a reason the CBO could claim was the justification for his Stop Work Order.

73. It is clear that the CBO in this matter listened to the Appellant's evidence and cross-examination, and tailored his own testimony based in part of that evidence and cross-examination. *Id.*

74. In addition to offering new explanations for his Stop Work Order, such as the existence of algae or mold, the CBO made reference to the testimony of Appellant's representative, Prashant Jain. *Id.*

75. The CBO tailored his justifications for the Stop Work Order to Mr. Jain's testimony. *Id.* Despite there being no mention of the light fixtures in the bathroom at Appellant's leasehold as part of the Stop Work Order, the CBO asserted it as a basis for the Stop Work Order in response to Mr. Jain's testimony.

76. Again, as Mr. Jain referenced a floating floor in his testimony that was not ever mentioned in the Stop Work Order nor prior to the hearing on the Appeal, the CBO listed it as a basis for the Stop Work Order. *Id.* These after the fact justifications which the CBO came up with after hearing Mr. Jain's testimony and were apparently never considered by the CBO prior to Mr. Jain's testimony. *Id.*

77. Not only does the CBO's tailored testimony illustrate the problems which arise when a citizen bears the burden of proof to show the invalidity of a general and non-specific Stop Work Order, it demonstrates that the CBO failed to perform his duty to investigate, to learn what work was done in the kitchen he claims require a permit.

78. The problems created by the burden of proof and the presumption of the validity of the Stop Work Order and the generality of the Stop Work Order altogether, created due process violations, the Court also determines that the PSO fails to contain a requirement for written findings which the Ordinance specifically requires.

79. As a result of the Board's failure to include in the PSO specific safeguards that are required under the law—while adding specific requirements that did not exist at law to the PSO—there were insurmountable problems for the Appellants both in pursuing the administrative appeal and in preparing their appeal of the Board of Appeal's decision to the County Council—which then reviewed the Board of Appeal's decision without any written findings and decision.

80. The PSO specifically states that the party appealing the Board of Appeals' decision must be appealed within 5 days of the decision being rendered, and must identify with specificity the basis for the appeal and how the decision is arbitrary and capricious or not in accordance with the law. *Id.*

81. Because the Board of Appeals did not produce any written findings to support its conclusory decision until after ordered to by this Court in December 2021, Appellant was handicapped in being able to identify with specificity its basis for appeal. The Appellant through Ms. Nucklos reached out to Alvin Leaphart by way of e-mail regarding the lack of transcripts and the Appellant's confusion as to how to proceed without a written findings. Leaphart responded and

instructed Ms. Nucklos to file their Notice of Appeal with the county clerk, noting that no written decision had yet been issued. *Id.*

82. No decision would ever be rendered until ordered by this Court in December 2021, except for a conclusory statement in the minutes of the Board of Appeals, which contained no findings as required by Section 10-84 of the Los Alamos County Code of Ordinances, and this was raised by Appellant by way of a Motion to Continue the September 8, 2020 hearing before the County Council as a result of the failure by the Board of Appeals to provide written findings to Appellant. *Id.* It was again raised by Appellant at the hearing before the County Council, but at no time were findings provided until an appeal had to be filed by Mr. Jain and an Order issued from this Court directing the Board of Appeals to prepare findings to support their decision. *Id.*

83. As a result, Appellant incurred significant attorney's fees and delays to obtain what they rightfully deserved under due process in the way of stated reasons for the decision by the Board of Appeals.

84. For the foregoing reasons, the Court finds that the proceedings below and the decision of the County Council and the Board of Appeals are not in accordance with the law, and violated the due process rights of Appellant.

## II. The Board of Appeals' decision is not supported by substantial evidence based on a whole-record review.

### A. The Board of Appeals and the County Council acted arbitrarily and capriciously in reaching its decision.

85. The Board of Appeals concluded that it is a technical board. The Board of Appeals is not a technical board.

86. In the case *Rio Grande Chapter of the Sierra Club v. New Mexico Mining Commission*, 2003-NMSC-005, the New Mexico Supreme Court held that it will generally defer to an agency's interpretation if it implicates an agency's expertise. *Id*, ¶ 17.

87. That case dealt with deference provided to the New Mexico Mining Commission, which consists of seven voting members: 1) the director of the Bureau of Geology and Mineral Resources of the New Mexico Institute of Mining and Technology; 2) the Secretary of the Environment; 3) the State Engineer; 4) the Commissioner of Public Land; 5) the Director of the Department of Game and Fish; and two members of the public appointed by the Governor with the advice and consent of the Senate. These two members are required to be chosen to represent and to balance environmental and mining interests while minimizing conflicts of interests.

88. The Board of Appeals carries no such equivalent in requirements for its membership, and membership on the Board of Appeals requires no specialized training or expertise, nor does membership require that its members fulfill certain special offices that relate to the Board of Appeal's subject matter. . *See* Oral Pronouncement, November 1, 2023.

89. Per Section 10-84 of the Los Alamos County Code of Ordinances, the Board of Appeals consists of the Chair of the County Council, the County Manager, and the Planning and Zoning Chair.

90. The Planning and Zoning Chair, of all three members of the Board of Appeals, would be the *only* one who may possess such expertise and qualifications equivalent to the membership outlined by the Mining Commission.

91. The fact that not all Board members carry the expertise and background in the field indicates that it does not qualify as a technical board requiring deference. The Board of Appeals is also not limited in its authority to technical matters.

92. The Board of Appeals held without any support, that claims such as retaliation or disparate treatment are outside of its narrow jurisdiction. The Los Alamos ordinances do not support this position. Section 10-81 states: "No such provision shall be construed as giving any Officer discretionary powers as to what regulations or standards shall be, or power to require conditions not prescribed this Article, or to enforce article provisions in an arbitrary or discriminatory manner."

93. Section 10-80 of the Ordinances holds that stop work orders may be revoked by the Building Official or the Council. It is the Board and the Council's authority and responsibility to oversee its Chief Building Official.

94. If the CBO is violating Section 10-81 of the Ordinances by applying the provisions if its article in an arbitrary or discriminatory manner, it's the *obligation* of the Board, as well as the County Council, to review such actions to ensure the proper oversight of the CBO exists, and if a stop work order is issued in an arbitrary or discriminatory manner, as was the Stop Work Order in this matter, the Council and the Board has the authority and responsibility to revoke that Stop Work Order.

95. It is irrelevant to the validity of the Stop Work Order that the County of Los Alamos takes the position that a single permit must be obtained for all *anticipated* work in a commercial remodel project prior to beginning any single portion of the permit-required work. *See* Oral Pronouncement, November 1, 2023.

96. The outcome of a failed application for a work permit is not that a Stop Work Order should issue. The outcome of a failed application is simply that no permit issues. In order for a Stop Work Order to issue, there must be a violation of either Section 10-80 of the Los Alamos County Code

of Ordinances, or NMAC 14.5.3.10. Nowhere does it state in either the NMAC or the Los Alamos Ordinances that a failed application for a work permit will result in a Stop Work Order issuing.

97. NMAC 14.5.29 specifically lists work that does not require a permit. In the Board of Appeals' Order, the Board acknowledges such work.

98. It is therefore irrelevant to the validity of the Stop Work Order that no permit was issued, as the individual who applied for a permit may continue to do work that does not require a permit. The record shows that Appellant was performing work at the property which did not require a permit when the Stop Work Order was issued.

99. The Stop Work Order in this case, according to the Board of Appeals, was issued because work requiring a permit was being conducted. The Board of Appeals, in its Order, held that "[t]here is overwhelming evidence supporting the CBO's determination that Appellant had commenced construction and alteration of 813 Central Avenue without obtaining the required permits." The Board went on to state that "there is substantial evidence that in the beginning of the commercial remodel at 813 Central Avenue, Appellant had commenced construction or alteration of a building without a building permit. . ."

100. The Court therefore evaluates whether or not work was being conducted requiring a permit without a permit having been obtained by Appellant. The Board of Appeals finds that work had commenced, and relied on case law precedent regarding the determination of when work commences, stating that one need not wait until ground is broken in order to determine that work has commenced.

101. The Board relies on *City of Las Cruces v. Rio Grande Gas Company*, 1967-NMSC-190, which the Board relies on for the proposition that "whether construction has commenced is a

question that is evaluated by all available evidence relating to the project." The Court would agree with that proposition.

102. However, the Court finds that the Board of Appeals acted arbitrarily and capriciously in not considering all available evidence. Also, the basis for some of the Board's decisions are not supported by substantial evidence.

103. Arbitrary and capricious action by an administrative agency consists of a ruling or conduct which, when viewed in light of the whole record, is unreasonable or does not have a rational basis, and is the result of an unconsidered willful and irrational choice of conduct and not the result of the winnowing and sifting process. ***Perkins v. Department of Human Services***, 1987-NMCA-148, ¶ 19.

104. An abuse of discretion is established if the agency has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings not supported by the evidence. Black's Law Dictionary defines capricious as "contrary to the evidence or established rules of law." Substantial evidence in an administrative agency review requires a whole-record review, not a review limited to those findings most favorable to the agency order. ***Perkins***, 1987-NMCA-148, ¶ 16. This requires the Court to review and consider not only the evidence in support of one party's contention, but also to look at evidence which is contrary to the administrative finding. The reviewing court must then decide whether, on balance, the agency's decision as supported by substantial evidence.

105. The Board of Appeals acted arbitrarily in considering portions of Mr. Jain's intention while disregarding other portions of Mr. Jain's intentions.

106. The Board's Order is not supported by substantial evidence. The Board, in its Order, contradicts the evidence presented to the Board during the Appeal. *See* Pronouncement, November 1, 2023.

107. The Board's order lists a number of appliances that it states the CBO saw Appellant had moved into the kitchen at 813 Central Avenue. Some of those appliances were pre-existing. *Id*. The Board of Appeals cites to portions of the record that do not support this statement. Instead, it is merely a citation to what was listed on Appellant's permit application for the concrete work they wanted to perform. *Id*.

108. Moreover, just a few pages before the citations provided by the Board of Appeal, contain testimony of Mr. Jain explicitly stating some of the appliances listed in the Board's Order as support were pre-existing. *Id*.

109. Thus, the Board's finding of fact that all the appliances outlined in their Order were moved into the kitchen by Mr. Jain is not supported by substantial evidence.

110. The Board also made a finding that the appliances were not connected, but that Appellant intended to connect them. This finding of fact is arbitrary and capricious because it relies only on one portion of Mr. Jain's intention. That portion was—at some point in the future—he planned to connect the appliances. The Board arbitrarily ignored Mr. Jain's stated intention to obtain the necessary permits prior to installing any of those appliances. *Id*.

111. It is arbitrary and capricious to consider the statement of intent which supports the CBO's decision while completely disregarding the statement made in the same breath which evidences intent to comply with the County's building codes and contradicts the CBO's decision.

112. This is especially arbitrary, as the *only* evidence of Mr. Jain's intention to install the appliances is his own testimony. It is arbitrary and capricious for the Board of Appeals to rely

on only a portion of Mr. Jain's intention that he intended to install those appliances at some point in the future, while disregarding ALL of the evidence to support his further intention to obtain a permit prior to installing any of the appliances contained in the kitchen.

113. The Board found that the CBO had observed a wooden bar structure with taps, large panels with brick images behind the bar structure, various construction materials, and a pass-through window, about which the CBO testified he was not sure when that window was installed.

114. A whole record review reveals that not only was the CBO unsure when the window was installed, but that the pass-through window was pre-existing prior to Appellant's occupancy at 813 Central Avenue. *Id.*

115. As this pass-through window was pre-existing, it should not have even been a consideration of the Board of Appeals. However, the Board of Appeals disregarded that testimony specific to its pre-existing condition and only considered the testimony of the CBO that he was not sure when it was installed. There is no finding by the Board of Appeals that Mr. Jain was untrustworthy, or that his credibility had been called into question, such that his testimony should be disregarded. In fact, the Board had relied on Mr. Jain's testimony as evidence to support its finding that he had planned to connect the appliances in the future.

116. The Board similarly ignored the testimony of Mr. Jain with regard to the construction materials in place at 813 Central Avenue.

117. The Board disregarded Mr. Jain's testimony regarding the metal studs and the reason for their presence at 813 Central Avenue. Mr. Jain testified that he had purchased the studs to build a countertop, but later changed his mind about using metal studs and no longer had a vehicle large enough to return the studs to where they were purchased from. That testimony was not considered by the Board.

118. The Board considered as evidence of the commencement of work the presence of a wooden bar structure with kegerator taps. The taps were not connected to any kegerators, and the CBO testified that he knew they were not hooked up to any kegerators. This testimony was disregarded while the presence of the kegerator taps is found by the Board to be evidence of the commencement of construction requiring a permit without a permit. Disregarding one part of the CBO's testimony while considering the rest is arbitrary and capricious.

119. The Board also considered as evidence the existence of large panels with brick images, sheetrock or other boards, drill bits, levels, a jigsaw, dust mask, and hammers at 813 Central Avenue as evidence that construction requiring a permit had commenced without a permit.

120. The CBO explicitly testified that he did not know if there were sheetrock or some other kind of boards at the site. However, the Board concluded these were sheetrock boards present. Despite the uncertainty in the testimony, this is relied on by the Board of Appeals to conclude that sheetrock or other boards were present, indicating construction requiring a permit had commenced.

121. The remaining materials were located atop an unattached counter that does not require a permit to construct. These are pieces of equipment that were being used by Mr. Jain to construct that countertop. There was no indication that they were being utilized for anything beyond that countertop in the evidence when looking at the entirety of the record.

122. With regard to the large panels with brick images behind the bar structure, those panels were clearly not installed. The images of these panels show they are resting against the wall, and the top edge of one of them is bending down.

123. Based on these findings, the Board of Appeals concluded that Appellant needed a County building permit, as well as electrical permits from the state.

124. The CBO's testimony does not support this conclusion. The CBO used the example of an HVAC unit placed on a roof needing a permit regardless of whether it is connected to support the contention that appliances sitting on the ground level in the kitchen area of 813 Central Avenue also require a permit. This extreme hypothetical does not provide support for the idea that appliances sitting on a concrete floor in a kitchen on the first floor somehow need to be evaluated to determine if the floor has the ability to carry the load of those appliances.

125. Despite all the considerations outlined by the Board of Appeals, all that is established by the evidence is:

a. That Mr. Jain had moved some appliances into the kitchen space and had not connected them, and had the intention to obtain permits prior to connecting them;

b. That Mr. Jain was constructing a countertop that did not require a permit;

c. That Mr. Jain had metal studs that he was not going to use and intended to return, which were merely being stored at 813 Central Avenue;

d. That there could have been or might not have been sheetrock or other boards present in the space that were not being used at the time;

e. That there were kegerator taps not connected to any kegerators, as all kegerators were not connected;

f. That there was a pass-through window that was pre-existing prior to Appellant's occupancy;

g. There were large panels with brick images painted on top of them that were not installed; and

h. There were drill bits, levels, a jigsaw, dust masks, and hammers present, that Mr. Jain was using to construct the counter that did not require a permit.

126. To the Board of Appeals, this constituted commencement of a commercial remodel where the installation of kitchen appliances was planned to occur without a permit.

127. As outlined above, many of the Board's findings were not supported by substantial evidence, and some of these findings were arbitrarily and capriciously made, as they disregarded some evidence that was specifically on point to their conclusions.

128. The Stop Work Order in this matter was not issued for mere storage. If the mere storage of appliances and materials was a violation of the code, a Stop Work Order could have been issued for that reason. But the Stop Work Order was issued for was based on the idea that Appellant had commenced a commercial kitchen remodel without a permit when one was required, not mere storage. The evidence does not support a finding that Appellant had commenced a commercial remodeling project.

129. For these reasons, the Court finds the Board of Appeals' conclusion that the Stop Work Order was lawfully issued as a result of the commencement of a commercial kitchen remodel is not supported by substantial evidence and is based upon arbitrary and capricious determinations of the reliability of some evidence and disregard of other evidence.

130. The Court notes in particular that the Board of Appeals relies on hearsay of the Director of the New Mexico Construction Industries Division, using the opinion of the Director to bolster its conclusion.

131. The mere consideration of this hearsay statement by the Board is arbitrary and capricious in that, during the proceedings before the Board of Appeals, there were a number of pieces of evidence submitted by Appellant that were excluded because of a determination by the Board of Appeals that there was a lack of foundation, or the rule of completeness was not satisfied, and other objections to hearsay. Even though the rules of evidence were merely guiding, to exclude evidence based on lack of foundation, technical application of the rule of completeness, and hearsay in some circumstances, and then to rely on what is clearly hearsay to provide support for

their determination that the CBO acted lawfully is an arbitrary and capricious act by the Board of Appeals.

132. What is particularly concerning about the Board's reliance on this hearsay is that it is misleading, as the Director of the CID was himself misled by the CBO. The CBO presented the Director with photographs of Mr. Jain working on his countertop at 813 Central Avenue (which did not require a permit) in a context shaped by the CBO which did not reflect accurately what was occurring.

133. The CBO's email to the Director informs the Director that Mr. Jain had been doing work he was not doing, and adding "95% new appliances." This is misleading. To rely on this hearsay when other hearsay has been excluded, and to place such reliance on that hearsay to confirm their conclusion is arbitrary and capricious and an unfair disregard of the hearsay rule.

134. Accordingly, the Board of Appeals acted arbitrarily and capriciously in reaching its decision that the CBO was justified in issuing a Stop Work Order.

**B. The Board of Appeals' determination the CBO fulfilled his duty of investigating and obtaining sufficient evidence to issue a Stop Work Order was arbitrary, capricious, and contrary to the evidence, including admissions by the CBO.**

135. The Board of Appeals found that the CBO conducted an inspection prior to issuing a Stop Work Order on November 12, 2019, and that he conducted a second inspection on November 22, 2019 prior to issuing the second Stop Work Order.

136. The CBO admitted that he could not see the kitchen from the windows outside of 813 Central Avenue. The CBO also admitted that he prepared both Stop Work Orders in this matter at his office based solely on the two photos taken from the windows outside of 813 Central Avenue that he was text-messaged from a coworker.

137. As a result, he issued his Stop Work Order based on those two photos alone, with no knowledge of what was happening within the kitchen at 813 Central Avenue, as the kitchen cannot be seen from the windows outside 813 Central Avenue.

138. The CBO never intended to conduct an inspection. The CBO testified that he arrived at 813 Central Avenue on November 12, 2019, and by chance Mr. Jain was there and let him in. At that time, he conducted a walkthrough. The fact that he prepared the Stop Work Order based only on the two photos and his justification for doing that is "because it's too hard to write in the car or on a window" does not comport with the Board of Appeals' conclusion that the CBO conducted an investigation required by NMAC 14.5.1.8(B).

139. A CBO has the ability to demand entry into a premises. He has the ability to demand someone inform him what is going on. Instead, the CBO, based on two photos that show Mr. Jain working on a bar structure that does not require a permit and some metal studs that were not installed, with no stated intention by Mr. Jain to ever install them, and some large panels with brick imagery on them which were not installed, is not satisfaction of the duty to investigate and obtain sufficient evidence to confirm the allegation of a violation.

140. With all the authority and power to conduct a walkthrough, to ask questions and to investigate, the CBO's ability to conduct a walk-through on November 12, 2019, was only a result of happenstance and the chance that Mr. Jain was there to have him walk through. The Stop Work Order had already been issued based on the two photos, and the CBO testified that this is the sole basis for which he had drafted the Stop Work Orders.

141. The walkthrough was only conducted because of Mr. Jain's invitation. Mr. Jain informed the CBO what was going on, and that there would not be any installation of the appliances

until a permit is obtained. After being allowed to conduct the inspection on November 12, 2019, the CBO did not issue the Stop Work Order that day.

142. However, the CBO demanded that a permit for work be provided, and that demand was the only reason that Mr. Jain sought a permit for the concrete work, and that he was providing information regarding the kitchen appliances that would be installed at a later date, when a permit was sought. It is because of this confusion caused by the demands of the CBO and the good intentions of Mr. Jain, that much of this transpired.

143. As a result of Mr. Jain's permit application, the permit was denied, as the CBO treated the application as a full kitchen remodel. That is why the CBO changed the $800 value to $8,000 with no notation or notice to Appellant that he had altered the document, even though he says in his own testimony that it should be more than $40,000.

144. It's after that the CBO prepared a second Stop Work Order (using the original Stop Work Order from November 12, 2019), and without even entering the premises, the CBO went to the premises on November 22, 2019, looked through the windows, and issued the Stop Work Order without the ability to see or know what is inside the kitchen or if any of the appliances have been installed.

145. The findings by the Board of Appeals that the CBO fulfilled his duty to investigate are not supported by the evidence. The CBO has the ability to investigate. He has the ability to demand entrance, and to have answers to his questions. The CBO did not investigate, demand entrance, or seek answers to his questions.

146. And for these reasons, the Court finds that the agency, the Board of Appeals and the County Council, acted arbitrarily and capriciously and, based upon a whole-record review, the

decision of the Board and the Failure the reverse that decision by the County Council is not supported by substantial evidence.

WHEREFORE, the Court hereby ORDERS that:

**A. The decision of the County Council and the Board of Appeal affirming the Stop Work Order are hereby reversed; and**

**B. The Stop Work Order issued against Appellant, being unsupported by evidence, violative of the Appellant's statutory and constitutional due process rights, is hereby declared invalid and void.**

Jason Lidyard
HONORABLE JASON LIDYARD
District Court Judge

Submitted by:

PHILIP J. DABNEY, P.C.

*/s/ Philip J. Dabney*
Philip J. Dabney, Esq.
*Attorney for Appellant*
1505 15th St., Suite C
Los Alamos, NM 87544
phil@dabneylawpc.com
(505) 662-3911

Approved as to form:

Sirphey et. al. v. Los Alamos et. al,
U.S. District Court New Mexico, Case No.
2022-cv 00465

EXHIBIT
2

0663

| REQUEST | FILED BY | FILING DATE | INSPECTION DATE | CONCERNS | DOCUMENTS WITHHELD | ANY RESOLUTION? |
|---|---|---|---|---|---|---|
| Mentions of "UnQuarked," "Prashant," "Jain," "Cortni," "Nucklos. | Prashant Jain | April 2019 | July 2019 September 2019 | There appeared to be some gaps and some known records missing, so RIM was asked to pull from server rather than ask for furnishment. | An email exchange between Michael Arellano and Terry Salazar on UnQuarked marked "confidential." | Document furnished months after request. |
| All correspondence regarding Permit # BLDC 2019-00515 | Cortni Nucklos / Prashant Jain | November 27, 2019 | N/A | CDD refused to comply because the permit was "on hold" despite communication from their office that it was "denied." No supporting law or case law provided. | Unknown Number of Records Never Furnished | N/A |
| Source correspondence for photos provided by Paul Andrus in email 'Re: Urgent – Please Reply' File1.JPG and File2.JPG Email dated: 11/27/2019. Requester seeks records which show the origination of photos provided to the County. | Cortni Nucklos / Prashant Jain | November 27, 2019 | December 12, 2019 | The County was requested to give the originating correspondence by which certain photos came into County possession. That record was later revealed to be from an illegal search conducted by Adrienne Lovato & Michael Arellano on November 10, 2019. Rather than have his subordinates furnish the records of that, Mr. Andrus furnished a record created, several days later, while Ms. Lovato and Mr. Arellano ignored the request. | Text messages between Michael Arellano and Adrienne Lovato on November 10, 2019 withheld by both. | Following complaints to the RIM office, Mr. Andrus and Ms. Lovato complied and furnished appropriate records. Mr. Arellano never has responded to this request, filed 831 days ago (as of 3.7.22) |
| All correspondence between Michael Arellano, Harry Burgess, and Paul Andrus that mentions 'Red Tag' or 'Stop Work' or '813 | Cortni Nucklos / Prashant Jain | November 27, 2019 | December 12, 2019 | Photos taken by Mr. Arellano on November 12th were emailed to others by Mr. Burgess on November 13th with no connecting | • One record withheld by Harry Burgess<br>• Two Records withheld by Michael Arellano | After complaints registered with the RIM Office, 5 previously withheld records were furnished by Andrus and Burgess. Michael |

| | | | | | | |
|---|---|---|---|---|---|---|
| Central Avenue' or 'Unquarked' during November 2019. | | | | communication. | • Two records withheld by Paul Andrus | Arellano has never furnished two records for this request filed 831 days ago (as of 3.7.22) |
| "All correspondence between Terry Salazar and any of the following individuals in 2019: Michael Arellano, Harry Burgess, Paul Andrus, Wendy Servey, Stephen Rinaldi." | Cortni Nucklos / Prashant Jain | November 27, 2019 | | Comparing records with Marcel Remillaux, Ms. Nucklos and Mr. Jain came to understand that two email exchanges between Michael Arellano and Terry Salazar were not furnished in this request. | Two email records between Michael Arellano and Terry Salazar | These two records have never been furnished by Michael Arellano. It has been 831 days (as of 3.7.22) |
| All correspondence that mentions any of the following from March 2019 – 11/27/2019: "CORTNI,""NUCKLOS," "PRASHANT," "JAIN," "UNQUARKED," "813 CENTRAL AVENUE," "BOESE," or "145 CENTRAL PARK SQUARE." | Cortni Nucklos | November 27, 2019 | | Having received the Romero/Lujan email in an earlier IPRA, it's absence was known. Additionally, the withholding of records by some county officials was revealed when others furnished or when gaps were present in communication. Some records that predate this request and were not furnished were furnished in later requests. And Bob Bourque forwarded his communications with Los Alamos County Council after learning that Ms. Nucklos and Mr. Jain did not receive them from the Councilors. | • 18 documented records<br>• One email between Jason Romero & Desirea Lujan<br>• Harry Burgess's text messages that mention UnQuarked<br>• Texts between Adrienne Lovato & Michael Arellano<br>• Emails between Burgess, Andrus, and Arellano entitled "813 Central Ave"<br>• An email between Michael Arellano and Antionette Padilla that includes "Prashant," "Jain," "Cortni," "Nuckles," "Unquarked," and "813 Central" | • Mr. Burgess furnished text messages that mention "UnQuarked" after a complaint was registered.<br>• Jason Romero has never furnished It has been 831 days since request (as of 3.7.22)<br>• Michael Arellano has never furnished the text messages. It has been 831 days since request (as of 3.7.22)<br>• Michael Arellano has never furnished |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | • Five emails between Sara Scott & Robert Bourque about "UnQuarked"<br>• One email between David Israelevitz & Robert Bourque about "UnQuarked"<br>• One email between Antonio Maggiore & Robert Bourque about "UnQuarked"<br>• Three emails between Randall Ryti & Robert Bourque about "UnQuarked"<br>• One email between Pete Sheehey & Robert Bourque about "UnQuarked" | the emails. It has been 831 days since request (as of 3.7.22)<br>• Sara Scott has never furnished emails. It has been 831 days since request (as of 3.7.22)<br>• David Israelevitz has never furnished the email. It has been 831 days since request (as of 3.7.22)<br>• Antonio Maggiore has never furnished the email. It has been 831 days since request (as of 3.7.22)<br>• Randall Ryti has never furnished emails. It has been 831 days since request (as of 3.7.22)<br>• Pete Sheehey has never furnished the email. It has been 831 days since request (as of 3.7.22) |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | exchange with Michael Arellano<br>• Unknown records mentioned in a subsequent HR Report | the time of request was directly contradictory to what it was altered to read. It had also been closed without cause.<br>• Michael Arellano has withheld a May 2019 email from this request for 502 days (as of 3.7.22)<br>• A subsequent human resources report revealed that Michael Arellano and Andrea Salazar knew they were not furnishing a particular record to Ms. Nuckols. Ms. Nuckols was not informed, and the record has remained unfurnished for 502 day past deadline |
| All records related to the written decision, including the written decision, | Cortni Nuckols | November 9, 2021 | Rolling - Digital | Los Alamos County repeatedly missed the legal deadline for furnishment | • 113 records furnished 9 days late on December 3, | • Records furnished, though very |

| | | | | | | |
|---|---|---|---|---|---|---|
| issued by the Planning and Zoning Board at the direction of District Court Judge Jason Lidyard, earlier this year. | | | | despite a series of complaints. | 2021<br>• 286 records furnished 19 days late on December 13, 2021<br>• 327 records furnished 28 days late on December 22, 2021 | late |
| All records — inclusive of but not limited to — time sheets and payment records to external parties, of Los Alamos County legal expenses for Sirphey LLC's Stop Work Order Appeal. Dates: 11/22/19 to present | Corini Nuckles | November 9, 2021 | Rolling - Digital | Los Alamos County missed the legal deadline on a request with only one responsive record. | • One record furnished 19 day late on December 13, 2021 | • Records furnished, though very late |
| All records related to Michael Arellano's April 2019 arrest for aggravated dwi and subsequent cases. This should be inclusive of but not limited to mentions of his arrest, mentions of his driver's license, records of his use of Los Alamos County vehicles between April 2019 and the termination of his contract, and mentions of any applicable whistleblowers. Dates: April 2019 to present. | Corini Nuckles | November 9, 2021 | Rolling - Digital | Los Alamos County missed the legal deadlin on a request with only one responsive record. | • One record furnished 28 days late on December 22, 2021 | • Records furnished, though very late |

| | | | | | | |
|---|---|---|---|---|---|---|
| Inspection records of 813 Central Ave by CDD/Chief Building Officer since October 1, 2019 | Cortni Nuckles | December 13, 2019 | December 16, 2019 | A photo of the 11/22/19 Stop Work Order was furnished, but no record of the several inspections performed for a permit for concrete prior to completion in December 2019. | All records of inspection on UnQuarked's permit application filed September 30, 2019.<br><br>Text messages and photos from Michael Arellano and Adrienne Lovato's search on November 10, 2019 | Following a complaint, the CDD furnished 5 previously-withheld records. The County has since conceded a search on November 10, 2019, but has never amended this furnishment. |
| Copies of pictures of "red tag" violations at 813 Central Ave. | Michael Arellano | February 24, 2020 – 4:18pm | February 24, 2020 – 4:25pm | Michael Arellano improperly filed an IPRA request on behalf of a third party despite having possession of the records the individual asked him for. He also altered the request made by the third party without consulting him and furnished the 10 results of his own IPRA request and forwarded them to the third party, implying the entire process wasn't orchestrated by him. | N/A | Los Alamos County has never acknowledged or responded to concerns about this violation of section 14-2-8 -C of the Inspection of Public Record Act. |
| All communications by Councilor Ryti, including text and email \| dates: July 25, 2020 to present" and "all communications by Larry Valdez, including text and email \| dates: August 6 to August 25 | Cortni Nuckles | August 28, 2020 | Rolling - Digital | Los Alamos County missed the legal deadline and could provide little information on why. | • 6 records furnished 3 days late<br>• 243 records furnished 6 days late<br>• 27 records furnished 20 days late. | • Records furnished late and some records were redacted to a larger extent than had been standard to that point. |
| All records and communication regarding the facade of Mari Mac Village Shopping Center. | Cortni Nuckles | August 6, 2020 | August 18, 2020 | The partial record furnished to Ms. Nuckles showed that it had been altered on August 12, 2020, 6 days after request. | • The full case file (until after two complaints were registered).<br>• A May 2019 email | • Full furnishment of the record revealed that the record at |